**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | |
|---|---|
| **RUMBLE INC.;** | ) |
| **RUMBLE USA INC.;** and | ) |
| **RUMBLE CANADA INC.,** | ) |
| | ) |
| *Plaintiffs,* | ) Case No. _____ |
| | ) |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| **WORLD FEDERATION OF** | ) |
| **ADVERTISERS; WPP PLC**; and | ) |
| **GROUPM WORLDWIDE INC.,** | ) |
| | ) |
| *Defendants.* | ) |
| _____ | ) |

## <u>COMPLAINT</u>

For its complaint against Defendants and each of them, Plaintiffs Rumble Inc., Rumble USA Inc., and Rumble Canada Inc. (collectively "Rumble") allege based upon personal knowledge and information and belief as follows:

### Nature of the Case

1.      This is an antitrust action relating to a cartel of competing advertisers and advertising agencies. Acting with and through the World Federation of Advertisers ("WFA") initiative called the Global Alliance for Responsible Media ("GARM"), the Defendants and numerous non-defendant co-conspirators collectively agreed to restrict the output of digital advertising on social media platforms, to fix price-related terms for digital advertising on social media platforms, and to withhold purchasing digital advertising from Rumble and other social media platforms, thereby increasing advertising costs for their clients, reducing earnings for online

content creators, depriving users of the benefits that flow from full and fair competition in digital advertising on social media platforms, and inhibiting the growth and profitability of one of the largest online video platforms in the United States.

2.     Prior to the conspiracy orchestrated by and through GARM, advertisers and their agencies made unilateral decisions about the suitability of advertising on a given platform, evaluating whether doing so struck the right balance of gaining access to consumers at a competitive price while mitigating the risk of their advertisements appearing alongside content that may be inconsistent with the marketing plans for their brand. In a competitive market, advertising agencies would compete with one another on their ability to place their customers' ads according to their customers' individual preferences and marketing plans.

3.     Platforms would also compete with one another to provide a variety of content that can appeal to different users as well as different advertisers. One aspect of this competition is in the standards those platforms apply that govern whether ads may appear alongside particular types of content. Some advertisers might choose to access more expensive advertising on platforms with more restrictive standards, running the risk that their competitors would get similar reach at a lower price by placing advertisements on other platforms with less restrictive standards.

4.     In a competitive market, where advertisers could choose to place advertisements on platforms with varying standards, both advertising agencies and platforms would incur costs in attempts to cater to the preferences of advertisers. Prior to GARM, advertising agencies used their own resources to identify platforms that met each client's standards and worked with individual platforms to ensure those standards were being met. With GARM in place, advertising agencies no longer needed to devote their individual resources to this process because GARM uses the market power of its members and their clients to force platforms to submit to GARM's demands

for fixed, blanket standards. GARM accomplished this by threat of exclusion by GARM members and their clients for non-complying platforms. Indeed, GARM used actual and threatened advertising boycotts to achieve its conspiratorial aims.

5.      The Sherman Act prohibits such concerted activity. The brand safety standards sought by advertisers and their advertising agencies should succeed or fail in the marketplace on their own merits and not through the coercive exercise of market power by the advertising agencies acting collectively to promote their own economic interests by restricting output, agreeing to price-related terms, and boycotting industry participants that do not join their conspiracy. All of this illegal conduct is done at the expense of platforms, content creators, and their users, as well as the agencies' own advertiser clients who pay more for ads as a result of their collusion.

6.      As a condition of GARM membership, GARM's members agree to adopt, implement, and enforce GARM's "brand safety" standards, including by withholding advertising from social media platforms deemed by GARM to be non-compliant with GARM's brand safety standards. Brand safety standards are commercially motivated; they are designed to ensure that advertisements do not appear alongside content that might harm the reputation of a brand and potentially reduce sales. Unlike content moderation standards, which determine what types of content may be shared on a social media platform in order to protect user safety and comply with relevant laws, brand safety standards relate to how advertising will be displayed on the platform and are implemented as part of a platform's commercial relationship with its advertisers.

7.      Pursuant to the conspiracy, major advertising agencies, including Defendants WPP plc ("WPP") and its subsidiary GroupM Worldwide Inc. ("GroupM") and numerous non-defendant co-conspirators, agreed not to place client advertisements on platforms like Rumble that do not adopt GARM's one-size-fits-all brand safety standards. Because GARM requires its

members to adhere to its policies, the conspirators' boycott of Rumble and other platforms effectively extended to all GARM members and their advertising clients. These actions are against the unilateral self-interest of the advertising agencies and advertisers; they make economic sense only in furtherance of a conspiracy performed with the confidence that a sufficient portion of competing advertising agencies and advertisers will do the same. They allow the conspiring advertising agencies to avoid competing for the best return on investment for their clients' advertisements and negate the risk that a competing agency or brand would step in to take advantage of the opportunity to reach additional potential customers at a lower cost. If advertising agencies were competing with one another on their ability to place ads consistent with an advertiser's individual marketing preferences, some would individually choose to place advertisements on Rumble's platform and receive exposure to Rumble's audience at a lower price than other options, gaining a competitive advantage.

8.     The harm caused by GARM's actions extends far beyond the Defendants and their co-conspirators. Because GARM counts as its members the world's six largest ad agency holding companies, including Defendant WPP, it strongly incentivizes individual advertisers to join the conspiracy or risk losing out on the benefits and efficiencies of representation by a major advertising agency. If an advertiser does not agree to GARM's terms and brand safety standards it cannot work through an ad agency that is a member of GARM or at a minimum will have to work independently of the agency for campaigns targeting social media platforms that do not conform to GARM's standards. This means that an advertiser cannot reap the benefits of representation by a GARM agency if it chooses to implement its own brand safety standards and advertise with platforms as it sees fit. Advertisers might desire to place advertisements on platforms like Rumble to gain a competitive advantage by maximizing the reach of their advertisements for a lower price,

but GARM creates strong economic incentives for them to forego this potential advantage if they wish to work through an advertising agency.

9.      The unlawful conduct alleged in this Complaint is currently the subject of an active investigation by the Committee on the Judiciary of the House of Representatives of the Congress of the United States ("House Judiciary Committee"). The House Judiciary Committee's investigation has included reviewing documents submitted to the committee in response to subpoenas issued to GARM and interviewing the senior GARM executive. The House Judiciary Committee issued an Interim Staff Report on July 10, 2024.

10.     That report concluded: "[t]he extent to which GARM has organized its trade association and coordinates actions that rob consumers of choices is likely illegal under the antitrust laws and threatens fundamental American freedoms. The information uncovered to date of WFA and GARM's collusive conduct to demonetize disfavored content is alarming."

11.     The Committee's investigation into the Defendants' and their co-conspirators' collusive conduct is ongoing and has the potential to unearth even more violations of the antitrust laws by the participants.

**Parties**

12.     Plaintiff Rumble Inc. is a Delaware corporation with its principal place of business in Florida. Rumble Inc. is publicly listed on the NASDAQ exchange. Rumble Inc. is the ultimate parent company of all Rumble entities.

13.     Plaintiff Rumble USA Inc. is a Delaware corporation with its principal place of business in Florida. Rumble USA Inc. enters into contracts with advertisers for U.S.-based advertising on Rumble's platform.

14.     Plaintiff Rumble Canada Inc. is an Ontario corporation that operates the Rumble video sharing platform with a principal place of business in Toronto, Canada, that has users and creators located in this District. It is an indirectly owned subsidiary of Rumble Inc.

15.     Defendant World Federation of Advertisers ("WFA") is an international not-for-profit association, organized under the laws of the Kingdom of Belgium and headquartered in Brussels, Belgium, that maintains an office in New York, New York. GARM is a committee of the WFA and reports to the WFA Executive Committee, comprised of many of the world's largest advertisers. WFA and GARM have members located in this District and WFA engages in a substantial volume of commerce throughout the United States and in this District.

16.     The WFA Executive Committee is responsible for the administration, representation, and management of the WFA and its activities. Through the WFA Executive Committee, WFA is dominated and controlled by competing advertisers and is dedicated to promoting their collective economic interests. According to WFA:

> *WFA is the only global organisation representing the common interests of marketers. It brings together the biggest markets and marketers worldwide, representing roughly 90% of global marketing communications spend, almost US$900 billion annually. WFA champions responsible and effective marketing communications.*

17.     Defendant WPP is a multi-national holding company based in London, England. It is one of the largest marketing and advertising holding companies in the world. Through its subsidiary, GroupM, WPP engages in a substantial volume of commerce throughout the United States and in this District. WPP is a member of GARM.

18.     Defendant GroupM, headquartered in New York, New York, is part of the multinational holding group WPP plc. GroupM owns four advertising agencies and is the largest

media buying company in the world. With more than $60 billion in annual media spend, its clients include some of the biggest companies in the world. GroupM is a member of GARM's Steer Team. GroupM engages in a substantial volume of commerce throughout the United States and in this District.

## Jurisdiction, Standing, and Venue

19.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§1331 and 1337.

20.     Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26.

21.     This Court has personal jurisdiction over each Defendant. WFA and GroupM each transact a substantial volume of business in this District. Both WFA and GroupM represent advertisers that conduct business in this District and GroupM advises clients on advertising campaigns that target consumers in this District. Furthermore, each Defendant, through its participation in the conspiracy alleged in this Complaint or otherwise, has substantial contacts with the United States. Among other things, the members of the conspiracy committed substantial acts in furtherance of that unlawful scheme within the United States, including in this District. And their unlawful conspiracy had foreseeable effects in the United States, including in this District.

22.     Venue is proper in this District under 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c), (d), and (f), because, among other things, each Defendant transacted business, was found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

23.     The conduct of the Defendants and their co-conspirators alleged herein had and continues to have a substantial effect on interstate commerce in the United States and in this District.

**Factual Allegations**

24.     Since 2013, Rumble has operated an online video platform whose founding business model has been premised upon helping the "little guy/gal" video content creators monetize their videos. Video content creators upload their copyright-protected videos to the Rumble platform (rumble.com or its mobile app) for users to view and interact with. Rumble monetizes creators' content in a variety of ways, including by placing digital advertisements alongside, before, during, and after their videos. Rumble also can make those videos available under license to other companies that have websites or other social media sites, and that want to make those videos available to visitors to their sites in order to generate advertising revenue. Rumble and its content creators receive advertising revenue from the advertisements that are made available to viewers of the content.

25.     Rumble seeks to protect a free and open Internet, and its content moderation policies comply with all relevant laws and reflect that goal. Rumble's commitment to freedom for its users and content creators is not just a philosophical choice, but also a commercial one. Social media platforms need to gather a sufficient number of both users and content creators to create a quality experience for their users and to derive sufficient advertising revenue to offset the costs of hosting their platform.

26.     The market for social media platforms is competitive, and platforms seek ways to differentiate themselves and attract users and content creators. While many of Rumble's competitors have adopted restrictive content and monetization policies, Rumble has seen explosive

growth in part because it attracts users and content creators looking for a platform that promotes freedom of expression. Rumble has also adopted policies that are friendlier to content creators than the policies of competing platforms. On Rumble, content creators can monetize their videos immediately, without first needing to build a certain number of followers, and content creators receive a greater share of the revenue generated by advertisements. Content creators have also been attracted to Rumble's platform because they are confident that their content will not be suppressed or removed if Rumble disagrees with the views that they express. These content creators in turn attract users to Rumble who are seeking out voices that might be unavailable or suppressed on rival platforms.

27.     Rumble has chosen not to implement monetization policies that are based on GARM's preferred brand safety standards. Because of this, Rumble forgoes spending significant resources on brand safety efforts, which allows it to offer advertising space at a lower price than other platforms that do invest resources in complying with restrictive brand safety standards. Instead, Rumble offers advertisers flexibility to choose the types of content and individual content creators that their advertisements appear alongside. In order to provide advertisers with a quality experience, Rumble has developed the Rumble Advertising Center, a tool that allows advertisers the freedom to customize and control their campaigns with real-time bidding, extensive targeting, and high value placement.

28.     Rumble began a period of significant growth in 2020, at a time when many competing platforms began introducing more restrictive content moderation and monetization policies. Rumble attracted many new users and content creators through its commitment to freedom of expression and promoting the interests of content creators. From 2020 to 2023, Rumble increased its monthly active users 36 times over. The average age and household income of

Rumble users is also higher than that of many competing platforms, making Rumble's audience uniquely attractive to many advertisers. Yet so far Rumble has not seen a growth in advertising revenue commensurate to its explosion in user popularity—even after initiating efforts to monetize the platform's content. That is because the timing of Rumble's growth coincided with the creation of GARM and the formation of the Defendants' conspiracy not to advertise on Rumble and other platforms that would not implement their required standards.

### *The Role of Advertising Agencies and Brand Safety Standards*

29.     In the market for digital advertising on social media platforms, advertising agencies play an important role in assisting their advertiser clients with the design, placement, and evaluation of their advertising campaigns. Advertising agencies help their clients determine on which social media platforms to purchase advertisements and the amount they should spend with different platforms for their campaigns.

30.     One of the roles of an advertising agency is to help clients navigate potential risks when placing an advertisement on a social media platform. Among other things, advertising agencies help their clients ensure that their advertisements are being viewed by their target audience in a contextual environment that does not cause reputational harm for the brand being advertised. For instance, if an advertisement for a brand were to appear before a video promoting illegal activity consumers may react negatively by associating the brand with the video or believing that the brand endorsed the message. This could in turn hurt the sales of the brand or convince customers to switch to a competing brand. Reducing the risk of such reputational and commercial harm is referred to in the advertising industry as "brand safety," and advertisers, agencies, and social media platforms typically develop their own standards for ensuring brand safety for advertisements placed alongside content on social media platforms.

31.     In a competitive market, each social media platform implements content standards and brand safety tools that are optimal for that platform and its users, while advertising agencies and their advertiser clients unilaterally select the platforms on which they advertise by comparing the cost of advertisements on the platform with the standards and tools that the platform offers for brand safety. Maintaining brand safety standards requires a platform to expend significant resources to monitor content on its platform and develop tools and policies that govern the placement of ads alongside its content. Therefore, platforms in a competitive market compete with one another for advertising revenue by choosing how to invest resources in different brand safety standards. Some platforms may choose to invest more resources into establishing and maintaining restrictive brand safety standards and pass those costs on to advertisers by charging higher prices for advertising space. Other platforms may choose to offer advertisers lower prices and implement brand safety standards that allow advertising alongside a greater variety of content, allowing advertisers to decide which content to monetize through advertisements.

32.     Through this competitive process, platforms develop and adopt the brand safety practices that best serve their interests to attract advertisers while maintaining freedom and profitability for the creators who post content on their platform. At the same time, advertising agencies would consider the brand safety needs of their individual clients to determine which platforms meet a client's needs. Advertisers have different brand safety risks. For instance, brands that aim their advertisements at children or their parents face higher risks that their advertisements might run alongside content that could cause reputational and commercial harm to their brand (such as appearing alongside content meant for adults). In contrast, some brands might even seek out the very content that poses a risk for other brands. For instance, the advertiser for a new first-person shooter video game would likely want their advertisements to be placed next to content

related to other first-person shooter video games to attract potential customers, while many brands would not want their advertisements associated with depictions of violence.

33.     One of the ways advertising agencies compete (or competed prior to the conspiracy) with one another is through brand safety measures that protect their advertiser clients from reputational and commercial harm. Because advertisers have different brand safety needs, the best advertising agency in a competitive market would create flexible, customizable, and robust brand safety policies for their clients to maximize the reach of the advertisements they place on social media platforms while reducing the risk of harm. If advertiser clients were unhappy with their agency's ability to protect their brand safety while also receiving a sufficient return on their advertising investments, they could move to a competitor that could provide a better brand safety service.

34.     But collective action among competing advertising agencies to dictate "brand safety" standards to be applied by all platforms uniformly—which necessarily implicates content standards and content moderation practices—has eliminated this competitive process and allowed a group of advertising agencies with massive market power to avoid the costs of competing with one another to determine the best platforms for the ads of their customers. GARM itself was designed to accomplish, and indeed accomplished, this specific purpose.

### The Global Alliance for Responsible Media

35.     In June 2019, WFA and some of its members established GARM as a forum to promote the economic interests of advertisers and their agencies in connection with advertising on social media platforms. GARM's members include advertisers, advertising agencies, and social media platforms.

36.     Rob Rakowitz co-founded GARM with WFA while employed as the Head of Global Media at Mars Incorporated, a founding WFA member. Mr. Rakowitz is currently the Initiative Lead for GARM. Mr. Rakowitz claimed in his testimony to the House Judiciary Committee that he is part of every significant decision made by GARM.

37.     GARM is governed by its Steer Team, which functions as GARM's board of directors. The Steer Team is comprised of representatives from Defendant GroupM, the American Association of Advertising Agencies (the "4A's," which represents advertising agencies), as well as other trade associations and many large individual advertisers such as Unilever and Mars. The Steer Team thus includes the world's largest advertising agencies and their trade association, along with some of the world's largest individual advertisers.

38.     GARM also counts as members each of the so-called "Big Six" advertising agency holding companies, which together hold nearly every major advertising agency in the world. Defendant WPP is one of the Big Six. In other words, nearly all major advertising agencies that execute advertising campaigns for large companies around the world actively participate in GARM and agree to follow GARM's terms. With WFA accounting for roughly 90% of the global spend on advertising and with GARM including almost every advertising agency and many of the world's biggest brands, GARM members collectively exercise incredible market power in the advertising market, including the market for advertising on social media platforms like Rumble.

39.     Although GARM membership is broader than advertisers and advertising agencies, the organization is (like the WFA itself) dominated and controlled by advertisers and their agencies, who use it to advance their collective economic interests. In its Charter, GARM states: "GARM is a first-of-its-kind industry-wide, but advertiser-centric community of global brands, media agencies, media owners and platforms, and industry bodies."

40.     The avowed purpose of GARM is to leverage the collective market power of its advertiser and agency members to advance their economic interests by forcing changes to the business operations of social media platforms that seek to sell advertising inventory to GARM members or their clients. GARM's Charter recognizes the "collective power" of GARM members to achieve this goal through "uncommon collaboration." Mr. Rakowitz has stated that "[u]ncommon collaboration needs to be understood as the industry coming together and putting aside competitive concerns in the interest of safety[.]" In a 2019 press release publicizing the formation of GARM, the WFA stated that collective action among advertisers to force commercial changes by social media platforms is the purpose of GARM: "Members of the Global Alliance for Responsible Media recognize the role that advertisers can play in collectively pushing to improve the safety of online environments." By "safety," GARM of course means commercial terms for digital platform content favorable to its advertising agency members and their advertiser clients.

41.     Advertisers and advertising agencies use GARM to force social media platforms to adopt advertiser-friendly policies that GARM's members were unable to obtain by acting unilaterally and in uncoordinated rivalry with one another. In 2019, Mr. Rakowitz explained GARM as a solution to frustration among the advertiser members of WFA with their inability to achieve their desired commercial outcomes in negotiations with social media platforms when acting on their own:

> Roughly a year ago, I drove a breakthrough on the WFA Media Board that point-to-point conversations were getting the industry nowhere; Mars having a conversation with YouTube separate from P&G, and P&G having a conversation with Facebook, and conversations happening at a local and global levels was simply inefficient and not reaching beyond advertising sales teams. In late spring, we started to drive moment around this idea of "uncommon collaboration" to break through the deadlock.

> Uncommon collaboration has all sides of the industry together, uncommon collaboration has competitors working together. The goals are to rise above individual commercial interest, focus on consumers and society, to drive focus that is endorsed by major customers of these platforms in a way that cannot be ignored, and finally ensure that there's access to the right decision makers who haven't been part of the demands hitherto.

42.    GARM has successfully forced changes to the business operations of some of the largest social media platforms through its abuse of its members' market power. These changes were not achieved prior to the formation of GARM and could not have been achieved by advertisers or advertising agencies working unilaterally. Only through actual and threatened boycotts by GARM members were these changes realized.

43.    For example, Meta, an operator of social media platforms including Facebook and Instagram (and a member of GARM), announced changes in 2022 to its reporting for advertisers and advertising agencies regarding where advertisements were appearing on its platform. GARM acknowledged this outcome was the result of its exercise of advertisers' collective market power through GARM. Mr. Rakowitz wrote to the CEO of the WFA that "[t]his is a big first step for [Meta], and should be acknowledged as a significant win we forced." Rakowitz made clear in a follow up email that Meta's message should be "without GARM we wouldn't have been able to make these moves," further reinforcing that GARM's coercive use of market power was controlling the business decisions of social media platforms. Rakowitz went on to write that GARM's "demands are being met" by digital platforms because GARM was operating "with a Roosevelt doctrine" of "speaking softly and carrying a big stick[.]" The stick in question was the collective market power of the world's largest advertisers and advertising agencies and threat of a boycott.

*The GARM Brand Safety Standards*

44.     The WFA organized GARM in part to promulgate standards relating to the placement of advertising on digital platforms. GARM's standards include "brand safety" standards, which govern the display of specified types of sensitive content on advertiser-supported social media platforms. GARM's standards also specify techniques to implement these brand safety standards and common measures of implementation for these brand safety standards.

45.     For instance, GARM has introduced a Brand Safety Floor and a Suitability Framework that identifies twelve categories of content that might appear on social media platforms, such as adult content, obscenity, and "debated sensitive social issue[s]." The Brand Safety Floor provides that advertisements may not appear next to content that falls below the Floor for each of these categories. For instance, advertisements may not appear alongside content that contains "excessive use of profane language or gestures." The Suitability Framework provides that advertisements may appear in connection with social media posts relating to the twelve identified categories only with advertiser consent. The Brand Safety Floor and Suitability Framework was first promulgated by GARM in September 2020 and was updated in June 2022.

46.     GARM's brand safety standards, including the Brand Safety Floor, promote the economic interests of GARM's advertiser and advertising agency members, including Defendant GroupM. GARM's advertising agency members have an economic incentive to force digital platforms to adopt and adhere to the GARM standards because it allows individual agencies and their advertiser clients to avoid competing with one another to better manage individual client brand safety standards by negotiating standards with each platform unilaterally. It also prevents competing advertisers from advertising with platforms that do not implement GARM's standards.

47.    GARM members monitor and follow through with their commitment to boycott social media platforms that do not conform to GARM's standards. Mr. Rakowitz and Defendant GroupM executives including Joe Barone, Managing Partner Brand Safety Americas, and John Montgomery, Executive Vice President, Global Brand Safety, for example, have discussed monitoring platforms "to make sure they don't stoop below the GARM floor." Defendant GroupM has placed Rumble on its "exclusion list" and will not place advertisements on behalf of its advertiser clients on Rumble's platform.

48.    Rumble has made multiple attempts to form a commercial relationship with GroupM over the years but has never received a meaningful response. In 2023 and 2024 alone, multiple members of Rumble's sales team sent emails to GroupM seeking to have GroupM purchase advertisements on Rumble's platform, but GroupM refused to engage with Rumble's outreach beyond a single meeting that GroupM ended without any follow-up.

49.    On multiple occasions since GARM's founding, Rumble has opened a dialogue with advertisers and ad tech providers that are GARM members with the intent of selling advertisement inventory to new customers. Despite many productive early conversations, the GARM members eventually declined to purchase advertisements on Rumble.

50.    By forcing GARM members and social media platforms to adopt and adhere to GARM's standards, GARM eliminates the need for agencies and advertisers to compete with one another through individual standards. Social media platforms host many types of content and individual advertisers have differing standards and commercial interests when placing their advertisements alongside that content. For instance, an advertiser selling products designed for teens may not want their advertisements placed alongside a video reviewing different alcoholic beverages, while advertisers selling beer may feel that the video will help them reach their target

audiences. The agencies and advertisers did not want to compete to determine what types of content were acceptable for their advertisements, and instead decided to use their collective market power, withholding advertising revenue that could otherwise flow from the Defendants and their co-conspirators in order, withholding advertising revenue that could otherwise flow from the Defendants and their co-conspirators in order to force social media platforms to remove or demonetize content according to a single, universal standard.

51.     Before GARM, each advertiser or advertising agency negotiated individually with social media platforms to maximize the reach of its ads while avoiding content that might be incompatible with the specific brands being advertised. This required advertisers and their agencies to invest resources in determining which platforms had content that would attract the audience they were hoping to reach with their advertisements and comparing the cost of those advertisements to the risk that their advertisements might also appear alongside content that could cause harm to their brand.

52.     Some digital platforms established platform-wide brand safety standards to provide advertisers and agencies with assurance that their content would not appear alongside unwanted content. Other digital platforms, like Rumble, opted not to invest resources in GARM's preferred brand safety standards but allowed advertisers and agencies flexibility to only advertise alongside desired content. For example, on Rumble, a pet food company can exclude political content by choosing only to run its ads alongside videos depicting cats or dogs. Smaller platforms like Rumble would not be able to compete with larger platforms like Facebook and YouTube on the amount of resources invested into building technological tools and hiring employees to monitor content for brand safety purposes, but they could offer lower prices to advertisers in part because they did not incur these costs. Advertisers that have lower risks of reputational harm or that can

more easily target their desired audience might have been attracted to the lower cost advertising opportunities provided by Rumble, but the Defendants and their co-conspirators have collectively forced them to refuse to advertise on Rumble and similar platforms.

53.     GARM's advertiser and agency members found these individualized negotiations costly and were frustrated that platforms did not always submit to their demands. Through GARM's standards, member advertisers and agencies collectively force social media platforms (i) to proactively remove or demonetize certain content that falls below the Safety Floor and (ii) to adopt costly tools to allow advertisers to more easily avoid certain other content subject to the Suitability Framework. Platforms like Rumble that deviate from GARM's standards are excluded from receiving advertising business from GARM's members. This allows GARM's advertisers and agencies to reduce their own costs and ensure that rivals that are also members of GARM cannot take advantage of lower cost advertising by buying advertisements on platforms that do not incur the costs associated with complying with GARM's standards.

54.     The policies that GARM forces on social media platforms are also not in the best interests of the platforms, the content creators, or their users. Creators who might otherwise be able to monetize their content through individual agreements with advertisers are now required to participate on platforms that meet GARM's standards in order to attract GARM members and Defendants, who make up or represent the vast majority of advertisers. In a competitive market, these creators might receive higher revenues from advertisements by placing their content on platforms that share a larger portion of advertising revenue with creators, but now must choose between platforms that enforce GARM's standards or forgoing revenue from GARM members.

55.     GARM openly admits that its standards are more restrictive and advertiser-friendly than what individual advertisers and agencies had been able to realize through unilateral and

independent negotiations with platforms. In the competitive market that existed before GARM, advertisers and agencies acted unilaterally, and platforms could negotiate for favorable terms that satisfied their content creators and users because reaching their unique and sizeable audiences is desirable to advertisers. GARM members could not control the standards of social media platforms by unilaterally and independently withholding their advertising purchases from those platforms because their competitors might choose to do business with the platform. GARM and its members recognized that combining the collective market power of GARM's advertiser and advertising agency members was necessary to force social media platforms to adopt and adhere to GARM's brand safety standards and bear their associated costs.

56.     GARM's public documents and policies make clear that it is not a mere voluntary standard-setting body.   Legitimate standard-setting bodies take into account the views of participants from all sides of an industry (such as both sellers and purchasers) to facilitate the creation of voluntary standards that benefit consumers. Legitimate standard-setting bodies do not prioritize the commercial desires of specific members or seek to control how industry participants develop and implement their own standards.   GARM went much further than setting voluntary standards.

### *GARM Members Collectively Agree to Follow and Enforce GARM's Brand Safety Standards*

57.     GARM does not merely collaborate to develop standards and policies that would protect brands' commercial reputations and leave it to agencies and advertisers to negotiate with social media platforms and determine when it is appropriate to implement GARM's standards. Instead, GARM's advertiser and advertising agency members collectively agree to adhere to GARM's standards in their own business operations and only purchase advertising on social media platforms that GARM deems to have met its standards.

58.     GARM's advertisers and advertising agencies made this collective agreement because adoption and implementation of GARM's standards by a sufficiently large collection of advertisers promotes the economic interest of those advertisers and advertising agencies. As one GARM document provides: "GARM's standards rely on system-wide adoption in order to realize [GARM's] goals." GARM acknowledges that its conspiracy requires wide adoption, and it has an economic motivation to enforce that its advertisers and advertiser agencies require social media platforms to comply with GARM standards to receive advertising revenue.

59.     The agreement by and among advertisers and advertising agencies to adopt, implement, and enforce GARM's standards is openly shared in GARM's public documents. GARM has publicized that participation in its conspiracy is a requirement of membership in GARM. GARM's Frequently Asked Questions page provides in relevant part:

> **Who can join GARM?**
>
> *Any advertiser, media agency, and media platform can join GARM provided they are willing to align with our charter, which calls for uncommon collaboration in confronting this challenge. Member organizations also agree to adopt GARM solutions to improve business operations. Membership currently includes more than 60 of the world's biggest advertisers, all six major agency holding companies, seven industry groups, and 10 media platforms.*

60.     GARM's advertisers and advertising agencies, including Defendants WPP and GroupM, have all agreed to adopt and implement the GARM standards in their own business operations. The GARM standards are "GARM solutions" that "[m]ember organizations also agree to adopt ... to improve business operations." Importantly, because each of the Big Six advertising agencies are all members of GARM, GARM can force any advertiser that wishes to be represented by a major agency, like Defendant GroupM, to adhere to GARM's standards. GARM's agency members are expected "to leverage the [GARM] framework to guide how they invest with

platforms at the agency-wide level," meaning GARM's agency members will follow GARM's standards for their clients when dealing with social media platforms on clients' behalf.

61.     The GARM FAQ explicitly states that GARM members will adopt and implement the GARM standards in their business operations with third parties such as social media platforms. Specifically, the FAQ states that GARM requires a "commitment" from members to "adopt and implement [GARM] solutions both internally and where working with partners." GARM intends for its standards to govern the commercial conduct of GARM members when purchasing advertising and partnering with social media platforms because it is necessary to further their conspiracy. GARM acknowledges that the purpose of its conspiracy is to protect the commercial interests of its advertiser and agency members. GARM states that the reason for its focus on social media platforms is because "[f]or advertisers who have invested heavily in these platforms, the danger of seeing their brands next to harmful content has become a major issue."

62.     GARM members' required "commitment" to "adopt and implement [GARM] solutions both internally and where working with partners" is not limited to unilateral conduct, but involves collective action among GARM members. GARM's goal is to "ensure that the industry works together" to remove what GARM considers "harmful content from advertiser-supported media on social media platforms" through "uncommon collaboration."

63.     GARM's collective action enables it to exercise market power to achieve goals in the economic interests of GARM's advertiser members at the expense of competition. GARM seeks to have its members "put[] aside competitive concerns" to achieve common commercial goals. GARM and its executives readily acknowledge that their behavior runs afoul of U.S. antitrust laws. In response to a question from one advertiser, Mr. Rakowitz offered to help formulate its plans for advertising on Spotify in a one-on-one conversation because GARM "can't

publicly advise all clients to" take a course of action because it would put GARM in "hot water by way of anticompetitive and collusive behaviors." But that is precisely what GARM has done through the implementation of its standards and requirement that members implement and adhere to GARM's standards. For instance, in GARM's new member application form for ad tech/developer members, applicants are required to agree to "make commensurate changes to business operations in pursuit of GARM's goals."

64.    The agreement by and among GARM's advertiser and advertising agency members, including Defendant GroupM, to adopt, implement, and enforce the GARM standards is further memorialized in the documents outlining GARM's Brand Safety Floor and Suitability Framework, which state "Individual GARM members will adopt these shared principles in their operations, whether they are a marketer, agency, or media platform." The Brand Safety Floor and Suitability Framework calls on advertising agencies to "leverage the framework to guide how they invest with platforms at the agency-wide level and at the individual campaign level." Further, it requires that "marketers," or brand advertisers, "will use the definitions to set brand risk and suitability standards for corporate, brand and campaign levels."

65.    GARM members, including Defendant GroupM, will from time to time bring suspected deviations from GARM's brand safety standards by social media platforms to the attention of GARM, which in turn will investigate those concerns and the degree to which a platform is adhering to GARM's brand safety standards. GroupM executives Mr. Barone and Mr. Montgomery, for example, have discussed with Mr. Rakowitz monitoring platforms "to make sure they don't stoop below the GARM floor." Platforms like Rumble that deviate from GARM's standards risk being placed on exclusion lists and boycotted by GARM members. Indeed, GroupM

has placed Rumble on its "exclusion list" and will not place advertisements on behalf of its advertiser clients on Rumble's platform.

66.     A more blatant way in which GARM members enforce GARM's standards is by collectively agreeing not to do business with social media platforms that do not submit to GARM's demands. For example, GARM encouraged its members to cease advertising on Twitter (now X) when Twitter was purchased by Elon Musk in 2022. GARM and its leadership, including Mr. Rakowitz, considered expelling Twitter from GARM for perceived failures to meet GARM's brand safety standards. GARM encouraged members to pull advertising revenue from Twitter unless the platform reiterated its commitment to adhering to GARM's standards.

67.     In addition to Twitter, GARM and GroupM sought to punish Spotify for hosting the *Joe Rogan Experience* podcast, which GroupM executive Joe Barone described as "spreading dangerous Misinformation." Barone and Mr. Rakowitz threatened Spotify's ability to join GARM (and collect revenue from GARM members) in 2022 if the platform did not adhere to their demands regarding content moderation on the platform.

68.     GARM advertisers and advertising agencies are discouraged from purchasing advertising on social media platforms deemed by GARM not to be complying with its standards because their agreements with GARM require them to adopt, implement, and enforce GARM's standards with regards to their advertising partners.

### *Relevant Markets and Market Power*

69.     The relevant product market in which to assess the conduct of Defendants and their co-conspirators alleged herein is the market for digital advertising on social media platforms. Social media platforms, like Rumble, are websites, applications, or other digital interfaces that allow creators to post content on the platform for other users to view and interact with. Advertisers

can pay social media platforms to place advertisements to appear alongside or within user-created content or they can pay platforms to promote their own posted content to increase its reach to more users. Rumble is a seller in the relevant product market, and the Defendants and their co-conspirators are purchasers in the relevant product market. Digital advertising sold by social media platforms has distinct characteristics that differentiate it from advertising sold by other types of online advertising, including search advertising, and from offline print, radio, and broadcast advertising.

70.    Digital advertising is differentiated from offline "traditional" media due to the ability of advertisers to use data to target specific audiences online. Social media platforms are accessed by users through websites or applications on personal computers or mobile devices such as smartphones. In contrast, offline media is accessed through print media, such as newspapers and magazines, or through mediums like radio and television.

71.    Digital advertising consists of display and search advertising. Display advertising refers to the display of advertisements—in the form of images, text, or videos—on websites or applications when a user visits or uses them. Search advertising is a form of digital advertising that is shown to a person when he or she enters a specific search term in an online search engine, like Google or Bing.

72.    Digital advertising on social media platforms (a type of display advertising) and search advertising are not substitutable because they perform different roles in the sales process. Search advertising is intent-based, designed to encourage consumers who have already shown interest in buying the product to make a purchase, whereas display advertising on social media is suitable for raising brand awareness and reaching new audiences that might not yet have shown interest. Additionally, search advertising is typically text-based and therefore provides limited

space for the client's creative message, while display advertising has more flexibility to use imagery, audio, and video.

73.    Digital advertising on social media platforms is differentiated from other forms of digital display advertising. Because social media platforms generally require users to create an account and allow for users to interact with user and advertiser-generated content on the platform, advertisers on social media platforms can target their advertisements to reach highly specific audiences in a way not possible through other forms of digital display advertising, such as display advertising on news-based websites or applications (for instance, the New York Times's website or application). Social media platform advertising and other forms of digital display advertising are also sold through distinct distribution channels. Social media platforms typically sell advertising inventory directly to advertisers and advertising agencies; whereas other forms of online display advertising inventory are sold through a complex ecosystem of intermediaries not active in the sale of social media platform advertising.

74.    One relevant geographic market is the world. Social media platforms sell digital advertising inventory to advertisers located around the world, and social media platforms are generally accessible worldwide. The Defendants and their co-conspirators purchase digital advertising inventory from social media platforms worldwide. Another relevant geographic market is the United States. Social media platforms sell digital advertising inventory for display in specific markets, including in the United States. The Defendants and their co-conspirators purchase digital advertising inventory for display in the United States.

75.    The Defendants and their co-conspirators have market power, called monopsony power on the buy side, in both relevant markets, controlling a majority of advertising spend on social media platforms globally and in the United States.

*Harm to Competition*

76.     Competition in the market for digital advertising on social media platforms has been restrained by the co-conspirators' actions, including restricting output of digital advertising, fixing price-related terms, and boycotting social media platforms that do not meet their agreed standards.

77.     The conspiracy continues to have its natural and intended effect on Rumble's business operations, and Rumble has suffered injury and damages as a result. Rumble's potential advertising customers are deterred, or (in the case of GARM members) restrained from purchasing from Rumble, leading to lost revenue and profit for Rumble and diminishing its equity value and goodwill. Rumble's advertising revenue today can only come from businesses that are not GARM members or clients of GARM member advertising agencies. Because demand for advertising on Rumble is artificially suppressed by the Defendants and their co-conspirators' conspiracy, the price Rumble's advertisers are willing to pay is diminished from what it would be if GARM members were free to choose to purchase advertisements on Rumble.

78.     As a result of the conspiracy, Rumble is a less effective competitor to other social media platforms in attracting content creators that seek to monetize their content, restricting output in the social media platform market as well.

79.     The sale of digital advertising is a necessary element for succeeding as a social media platform. By sharply curtailing its revenues, the boycott has reduced Rumble's ability to invest in new or improved functionality, thus harming both Rumble's ability to compete and the consumers and creators who use Rumble's platform.

80.     Advertisers are also harmed by the co-conspirators' actions. They are deprived of the benefits of advertising agencies competing to better serve their brand and marketing

preferences across different types of online content. The advertising agencies have agreed not to compete and instead demand that all social media platforms adhere to GARM's fixed, one-size-fits-all standards.

81.     The harm to competition caused by GARM and Defendants also extends to content creators. Creators who might otherwise be able to monetize their content through individual agreements with advertisers are unable to if the advertiser is a member of GARM.

82.     These harms to competition ultimately impact the users of Rumble and other platforms as well, who see less choice in and competition among platforms, fewer relevant ads, and less content.

## CLAIMS

## Count I – Horizontal Agreement to Restrict Output
## in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1

83.     Plaintiffs repeat and reallege every preceding allegation as if fully set forth herein.

84.     The conduct of Defendants and their co-conspirators alleged herein is a horizontal agreement to restrict the output of digital advertising on social media platforms in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. Defendants and their co-conspirators agreed to impose uniform brand safety standards on social media platforms with the purpose and effect of reducing the placement of, or eliminating entirely, digital advertising on certain disfavored platforms. The agreement has restricted the total output of digital advertising on social media platforms, harming competition, advertisers, content creators, social media platforms, and users, including by raising the price of digital advertising.

85.     Defendants' illegal activities have operated in or within the flow of interstate commerce or have significantly affected interstate commerce.

86.     The conduct of Defendants and their co-conspirators alleged herein is *per se* illegal, or in the alternative illegal under the Rule of Reason or "quick look" analytical framework. There are no legally cognizable procompetitive effects of or justifications for the agreement to restrict output, which was not reasonably related to, or reasonably necessary for, any procompetitive objectives of the GARM brand safety standards. Alternatively, there are no legally cognizable procompetitive effects of or justifications for the agreement to restrict output that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

87.     As a result of the foregoing illegal conduct by the Defendants, Rumble has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. §15, including in the form of lost profits and diminished equity value and goodwill, reducing the value of Rumble as a going concern.

### Count II – Horizontal Agreement to Fix Certain Price-Related Terms in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1

88.     Plaintiffs repeat and reallege every preceding allegation as if fully set forth herein.

89.     The conduct of Defendants and their co-conspirators alleged herein is a horizontal agreement to fix certain price-related terms in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. Defendants and their co-conspirators agreed to apply uniform price-related terms for digital advertising for social media platforms—namely GARM's brand safety standards, including the Brand Safety Floor and Suitability Framework—for the purpose of eliminating competition among advertising agencies based on their ability to place their customers' ads according to their customers' individual preferences and marketing plans. These fixed price-related terms have had the direct and foreseeable effect of raising the price of digital advertising, harming competition, advertisers, content creators, Rumble, and Rumble's users.

90.     Defendants' illegal activities have operated in or within the flow of interstate commerce or have significantly affected interstate commerce.

91.     The conduct of Defendants and their co-conspirators alleged herein is *per se* illegal, or in the alternative illegal under the Rule of Reason or "quick look" analytical framework. There are no procompetitive effects of the agreement to fix price-related terms that directly impact the price of digital advertising for social media platforms. The agreement is not reasonably related to, or reasonably necessary for, any procompetitive objectives of the GARM brand safety standards. Alternatively, there are no procompetitive effects of the agreement to fix these terms that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

92.     As a result of the foregoing illegal conduct by the Defendants, Rumble has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. §15, including in the form of lost profits and diminished equity value and goodwill, reducing the value of Rumble as a going concern.

### Count III – Concerted Refusal to Deal
### in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1

93.     Plaintiffs repeat and reallege every preceding allegation as if fully set forth herein.

94.     The conduct of Defendants and their co-conspirators alleged herein is a concerted refusal to deal in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. Defendants and their co-conspirators agreed to withhold purchases of digital advertising from Rumble, or, at a minimum, to abide by standards that would have the direct and foreseeable effect of precluding purchasing digital advertising from Rumble, thus harming competition, advertisers, content creators, Rumble, and Rumble's users.

95.     Defendants' illegal activities have operated in or within the flow of interstate commerce or have significantly affected interstate commerce.

96.     The conduct of Defendants and their co-conspirators alleged herein is *per se* illegal, or in the alternative illegal under the Rule of Reason or "quick look" analytical framework. There are no procompetitive effects of the refusal to deal, which was not reasonably related to, or reasonably necessary for, any procompetitive objectives of the GARM brand safety standards. Alternatively, there are no procompetitive effects of the refusal to deal that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

97.     As a result of the foregoing illegal conduct by the Defendants, Rumble has been injured in its business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. §15, including in the form of lost profits and diminished equity value and goodwill, reducing the value of Rumble as a going concern.

### Prayer for Relief

Wherefore, Plaintiffs respectfully prays for relief and judgment against Defendants as follows:

a.  That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

b.  That the Court hold Defendants jointly and severally liable for the injuries caused by each one of them and their non-defendant co-conspirators and award Plaintiffs actual damages in an amount to be determined at trial, such amount to be trebled as permitted by law;

c.  That the Court award Plaintiffs pre- and post-judgment interest on any recovery;

d.  That the Court award Plaintiffs its costs of suit, including reasonable attorneys' fees and expenses;

e.  That the Court award Plaintiffs a permanent injunction under Section 16 of the Clayton
    Act, enjoining Defendants from continuing to conspire with respect to the purchase of
    advertising from Plaintiffs; and

f.  That the Court award such other relief as the Court may deem just and proper.

## Jury Trial Demand

Plaintiffs hereby demand a trial by jury of all claims so triable in this lawsuit.

August 6, 2024                          Respectfully Submitted.

                                        */s/ John C. Sullivan*
                                        John C. Sullivan
                                        Texas Bar No. 24083920
                                        john.sullivan@the-sl-lawfirm.com
                                        Jace R. Yarbrough
                                        Texas Bar No. 24110560
                                        jace.yarbrough@the-sl-lawfirm.com
                                        **S|L Law PLLC**
                                        610 Uptown Blvd., Suite 2000
                                        Cedar Hill, TX 75104
                                        Phone: (469) 523-1351
                                        Facsimile: (469) 613-0891

                                        Mark Meador*
                                        mark@kressinmeador.com
                                        Brandon Kressin*
                                        brandon@kressinmeador.com
                                        **Kressin Meador Powers LLC**
                                        300 New Jersey Ave., Suite 900,
                                        Washington, DC 20001
                                        Tel: 202.464.2905

                                        **pro hac vice* motion forthcoming

                                        ***Attorneys for Plaintiffs Rumble Inc.,
                                        Rumble USA Inc., and Rumble Canada Inc.***