# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| RUMBLE INC.; RUMBLE USA INC.; and RUMBLE CANADA INC., |  |
| *Plaintiffs*, | Case No. 7:24-cv-00115-B |
| v. |  |
| WORLD FEDERATION OF ADVERTISERS; DIAGEO PLC; WPP PLC; and GROUPM WORLDWIDE INC., |  |
| *Defendants*. |  |

**Defendants' Memorandum in Support of Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim**

## Table of Contents

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    A.   The Parties ................................................................................................. 2

    B.   Rumble's business model involves minimal content moderation and brand-safety standards. ................................................................................................. 3

    C.   The Global Alliance for Responsible Media and the Brand Safety Framework ............. 4

    D.   Rumble files this antitrust case. ................................................................... 6

THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS ................................................. 7

    I.   There is no personal jurisdiction under Texas's long-arm statute. ...................................... 8

    II.   There is no personal jurisdiction under Section 12 of the Clayton Act because venue would not be proper under Section 12. ................................................................. 9

    III.   Rule 4(k)(2) does not help Rumble. ....................................................................11

THE NORTHERN DISTRICT OF TEXAS IS NOT A PROPER VENUE ................................................... 13

    I.   The Clayton Act does not provide for venue in this district. ........................................... 14

    A.   Rumble has not alleged that any Defendant "transacts business" in this district. ........ 14

    B.   Rumble has not alleged that any Defendant is an "inhabitant" of, or "found" in, this district. ......................................................................................... 17

    II.   The general federal venue provision—28 U.S.C. § 1391—does not provide for venue in this district. ............................................................................................. 18

RUMBLE FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED ...................................... 19

    I.   The Amended Complaint does not plausibly allege an agreement. ................................. 20

    A.   Rumble never alleges that Defendants directly agreed not to advertise on its platform. 20

    B.   The Brand Safety Framework does not prohibit advertising on Rumble. .................... 21

    C.   There is no plausible allegation that Defendants agreed to make any advertising decisions because of the Brand Safety Framework. ............................................. 21

    D.   The timing of Defendants' decisions, and simple economic common sense, refute any inference of agreement. ............................................................................. 24

    II.   Rumble does not plausibly allege a *per se* violation of the Sherman Act. ....................... 26

    III.   Rumble has not plausibly alleged a Sherman Act violation under the rule of reason. . 28

    A.   Rumble has not defined a viable relevant market. .............................................. 29

    B.   Rumble has not plausibly alleged harm to competition. ...................................... 32

    C.   The procompetitive benefits of brand-safety standards outweigh any anticompetitive harms. ................................................................................................. 35

IV.     The Amended Complaint's vague request for injunctive relief must be dismissed. ...... 36

**CONCLUSION** ............................................................................................................................ **37**

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Unione Mediterranea Di Sicurta*,
    364 F.3d 646 (5th Cir. 2004) ................................................................13

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*,
    826 F.2d 1235 (3d Cir. 1987).................................................................33

*Allen v. Vertafore, Inc.*,
    28 F.4th 613 (5th Cir. 2022) ...................................................................5

*Alpine View Co. Ltd. v. Atlas Copco AB*,
    205 F.3d 208 (5th Cir. 2000) ............................................................9, 12

*Am. Home Healthcare Sys., Inc. v. Floyd Mem'l Hosp. & Health Servs.*,
    No. 3:17-CV-00048, 2017 WL 2261740 (W.D. Ky. May 23, 2017) .....................................15

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002) ................................................................31

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    571 U.S. 49 (2013)...............................................................................13

*B. J. Semel Assocs., Inc. v. United Fireworks Mfg. Co.*,
    355 F.2d 827 (D.C. Cir. 1965)...............................................................15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................20, 22

*Black v. Acme Mtks., Inc.*,
    564 F.2d 681 (5th Cir. 1977) ...........................................................14–15

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
    49 F.4th 520 (5th Cir. 2022) ................................................................20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..............................................................................33

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
    846 F.3d 1297 (10th Cir. 2017) ........................................................30

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
    532 F.3d 1111 (10th Cir. 2008) ........................................................30

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
    447 U.S. 557 (1980)........................................................................36

*Consol. Metal Prods. v. Am. Petrol. Inst.*,
    846 F.2d 284 (5th Cir. 1988) ................................................... *passim*

*Corr Wireless Commc'ns., L.L.C. v. AT & T, Inc.*,
    907 F. Supp. 2d 793 (N.D. Miss. 2012)..............................................11

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    491 F.3d 380 (8th Cir. 2007) ...........................................................36

*Crosswell v. Martinez*,
    120 F.4th 177 (5th Cir. 2024) ..........................................................19

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)..........................................................................8

*Daniel v. Am. Bd. of Emergency Medicine*,
    428 F.3d 408 (2d Cir. 2005)................................................10, 16, 19

*Datamedia Comput. Serv., Inc. v. AVM Corp.*,
    441 F.2d 604 (5th Cir. 1971) ......................................................14–15

*Delta Brands Inc. v. Danieli Corp.*,
    99 F. App'x 1 (5th Cir. 2004) ............................................................9

*Dennis v. JPMorgan Chase & Co.*,
    343 F. Supp. 3d 122 (S.D.N.Y. 2018)...............................................17

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
    46 F.4th 226 (5th Cir. 2022) ...........................................................11

*Eagle Metal Prods., LLC v. Keymark Enter., LLC*,
    651 F. Supp. 2d 577 (N.D. Tex. 2009) ...............................................9

*Eastman Kodak Co. v. S. Photo Materials Co.*,
    273 U.S. 359 (1927)........................................................................18

*Fruehauf Corp. v. FTC,*
    603 F.2d 345 (2d Cir. 1979)............................................................................33

*FTC v. Tempur Sealy Int'l, Inc,*
    No. 4:24-cv-02508, 2025 WL 384493 (S.D. Tex. Jan. 31, 2025)............................31

*Go-Video, Inc. v. Akai Elec. Co.,*
    885 F2d 1406 (9th Cir. 1989) ............................................................................11

*Golden Bridge Tech., Inc. v. Motorola, Inc.,*
    547 F.3d 266 (5th Cir. 2008) .....................................................................24, 34–35

*Golf City, Inc. v. Wilson Sporting Goods, Co.,*
    555 F.2d 426 (5th Cir. 1977) .......................................................................15–16

*Green v. U.S. Chewing Gum Mfg. Co.,*
    224 F.2d 369 (5th Cir. 1995) ............................................................................14

*GTE New Media Servs., Inc. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000)....................................................................10–11

*Harbour v. Heyl Truck Lines, Inc.,*
    No. 24-CV-0183, 2024 WL 1317805 (N.D. Tex. Mar. 27, 2024) ...........................7

*Hardy v. Scandinavian Airlines Sys.,*
    117 F.4th 252 (5th Cir. 2024) ............................................................................12

*Host Int'l, Inc. v. MarketPlace, PHL, LLC,*
    32 F.4th 242 (3d Cir. 2022) ...............................................................................33

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995)..........................................................................................37

*Illumina, Inc. v. FTC,*
    88 F.4th 1036 (5th Cir. 2023) .......................................................................31–32

*In re Auto. Refinishing Paint Antitrust Litig.,*
    358 F.3d 288 (3d Cir. 2004)...............................................................................11

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.,*
    997 F. Supp. 2d 526 (N.D. Tex. 2014) .................................................................25

*It's My Party, Inc. v. Live Nation, Inc.,*
    811 F.3d 676 (4th Cir. 2016) ............................................................................31

*Jebaco, Inc. v. Harrah's Operating Co.*,
  587 F.3d 314 (5th Cir. 2009) ................................................................33

*Jones v. Reeves*,
  121 F.4th 531 (5th Cir. 2024) ...............................................................34

*Kamakahi v. Am. Soc'y for Reproductive Med.*,
  No. 11-cv-01781, 2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) .................... 29-30

*Kelvin Serv., Inc. v. Lexington State Bank*,
  46 F.3d 13 (5th Cir. 1995) ....................................................................7

*King v. Johnson Wax Assocs., Inc.*,
  565 F. Supp. 711 (D. Md. 1983) ...........................................................16

*KM Enters., Inc. v. Global Traffic Techs., Inc.*,
  725 F.3d 718 (7th Cir. 2013) ...............................................................10

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) ...............................................................13

*Lifewatch Servs. Inc. v. Highmark Inc.*,
  902 F.3d 323 (3d Cir. 2018).............................................................30, 32

*Marucci Sports, LLC v. NCAA*,
  751 F.3d 368 (5th Cir. 2014) ........................................................ *passim*

*Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*,
  107 F.3d 1026 (3d Cir. 1997)...............................................................16

*Mgmt. Insights, Inc. v. CIC Enter., Inc.*,
  194 F. Supp. 2d 520 (N.D. Tex. 2001) ........................................11, 15, 18

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
  806 F.3d 835 (5th Cir. 2015) ........................................................20, 26

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024)........................................................................36

*Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n*,
  No. 3:08-cv-0158, 2008 WL 4146022 (N.D. Tex. Sept. 9, 2008)...................19

*NCAA v. Alston*,
  594 U.S. 69 (2021)..............................................................................28

*New Orleans Assoc. of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries,*
56 F.4th 1026 (5th Cir. 2023) ...................................................................29

*Norris v. Hearst Tr.,*
500 F.3d 454 (5th Cir. 2007) ....................................................................34

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
472 U.S. 284 (1985).................................................................................27

*Ohio v. Am. Express Co.,*
585 U.S. 529 (2018)........................................................................... *passim*

*Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC,*
No. 23-cv-0155, 2024 WL 1218573 (N.D. Tex., Mar. 21, 2024)...........................10

*Pac. Car & Foundry Co. v. Pence,*
403 F.2d 949 (9th Cir. 1968) ...................................................................15

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.,*
615 F.3d 412 (5th Cir. 2010) ...................................................................29

*Pulse Network, L.L.C. v. Visa, Inc.,*
30 F.4th 480 (5th Cir. 2022) ...................................................................34

*Quality Auto Body, Inc. v. Allstate Ins. Co.,*
No. 79-cv-3351, 1980 WL 1887 (N.D. Ill. Aug. 19, 1980) ..................................29

*Ramzan v. GDS Holdings Ltd.,*
No. 18-cv-539, 2019 WL 4748001 (E.D. Tex. Sept. 30, 2019)...............................11

*San Antonio Tel. Co. v. Am. Tel. & Tel. Co.,*
499 F.2d 349 (5th Cir. 1974) ...................................................................17

*Sangha v. Navig8 ShipManagement Priv. Ltd.,*
882 F.3d 96 (5th Cir. 2018) ................................................................8–9

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
801 F.3d 412 (4th Cir. 2015) ...................................................................35

*Somers v. Apple, Inc.,*
729 F.3d 953 (9th Cir. 2013) ...................................................................24

*Southampton, Ltd. v. Le Norman*,
No. 18-CV-1089, 2019 WL 7902959 (N.D. Tex. Sept. 3, 2019) ............................................13

*Stuart v. Spademan*,
772 F.2d 1185 (5th Cir. 1985) ................................................................................8, 13

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)...............................................................................................30

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
496 F.3d 403 (5th Cir. 2007) .................................................................................25–26, 28

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*,
89 F.3d 233 (5th Cir. 1996) ..............................................................................................31

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)..................................................................................................30–31

*United States v. Scophony Corp. of Am.*,
333 U.S. 795 (1948).................................................................................................14, 17

*Universal Amusements Co. v. Gen. Cinema Corp.*,
635 F. Supp. 1505 (S.D. Tex. 1985) ...................................................................................35

*Verizon Commc'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)..................................................................................................20, 36

*Viazis v. Am. Ass'n of Orthodontists*,
314 F.3d 758 (5th Cir. 2002) ..............................................................................................24

*Victory Renewables, LLC v. Energy Trading Co., LLC*,
No. 18-cv-00456, 2019 WL 2539209 (N.D. Tex. Feb. 8, 2019) .............................................13

*Wampler v. Sw. Bell Tel. Co.*,
597 F.3d 741 (5th Cir. 2010) ..............................................................................................29

**Federal Statutes**

15 U.S.C. § 15................................................................................................................14

15 U.S.C. § 22...........................................................................................................10, 14

28 U.S.C. § 1391..........................................................................................................18

**Other Authorities**

Fed. R. Civ. P. 12(b) ...............................................................................................13–14

Fed. R. Civ. P. 4(k)(2)............................................................................................11–13

Phillip E. Areeda & Herbert Hovenkamp, *An Analysis of Antitrust Principles and Their Application* ...............................................................................................32

**INTRODUCTION**

This case has nothing to do with Texas, much less the Northern District of Texas. Every Defendant is a non-Texan that operates its business from outside of Texas, including places as distant as New York City, London, England, and Brussels, Belgium. The three Rumble Plaintiffs, too, are non-Texas businesses that operate out of Canada and Florida. Indeed, this Court would search the Amended Complaint in vain for a single allegation that anything about Rumble's claims happened in this district. Accordingly, this case should be dismissed for lack of personal jurisdiction and improper venue. Alternatively, the Court should grant the forthcoming Motion to Transfer Venue.[1]

But if the Court concludes it has personal jurisdiction over Defendants and that venue is proper, then it should dismiss the Amended Complaint for failure to state a claim. Rumble—a user-generated video platform—complains that Defendants (and others) have decided not to advertise on its platform. But those decisions can only possibly present an antitrust problem if they are the result of an *agreement* not to advertise on Rumble, and Rumble never alleges that Defendants had any such agreement. Instead, Rumble tries to convert a trade association initiative's short-lived, voluntary "Brand Safety Framework" into a global conspiracy. But Rumble does not allege that Defendants have *ever* advertised on Rumble, either before, during, or after the Brand Safety Framework's existence. Further, the Brand Safety Framework says nothing at all about Rumble or any other platform, so it is not an agreement to do anything at all with respect to Rumble.

Separately, Rumble failed to allege a relevant market. The relevant market it proposes is both inconsistent with Rumble's own theory of liability and impermissibly gerrymandered.

---

[1] The only US location with any specific alleged connection to Defendants is "New York, New York," Am. Compl. ¶¶ 16, 20, which will serve as a basis for the separate motion to transfer this case to the Southern District of New York.

Moreover, there are perfectly good non-boycott reasons why Defendants and others have chosen not to advertise on Rumble, which prides itself on lax content moderation and brand-safety measures.

Simply put, the Amended Complaint does not plausibly allege either an agreement, a relevant market, or a harm to *competition*. Rumble's claims are instead an attempt to force Defendants to do business with Rumble despite many competitive reasons not to do so. Rumble should not be allowed to weaponize the antitrust laws to create that business relationship and force advertisers to speak on its platform (notwithstanding their First Amendment rights).

The Court should dismiss this case for lack of personal jurisdiction and improper venue or else grant the forthcoming transfer motion. Alternatively, it should dismiss the Amended Complaint for failure to state a claim.

## BACKGROUND

### A.    The Parties

Plaintiffs Rumble Inc., Rumble USA Inc., and Rumble Canada Inc., ("Rumble") are non-Texas businesses that operate an online user-generated video platform out of Canada. Am. Compl. ¶¶ 13–15.

The World Federation of Advertisers ("WFA") is a Belgian not-for-profit trade association based in Brussels, Belgium, not in this district. Am. Compl. ¶ 16; App'x 5 (Loerke Decl. ¶¶ 4–5). WFA has never maintained any business operations in Texas, let alone in this district. App'x 5 (Loerke Decl. ¶ 6).

WPP plc is a multi-national holding company of advertising, public relations, media, and market research companies incorporated under the law of the Bailiwick of Jersey and headquartered in London, England. Am. Compl. ¶ 16; App'x 7 (Kelly-Bisla Decl. ¶¶ 3–5). As a pure holding company, WPP does not transact any business in the United States and none of its

executives are based in the United States. App'x 6 (Kelly-Bisla Decl. ¶¶ 6–7). Indeed, since WPP itself is a holding company that does not do anything except hold, Rumble's allegations about WPP are funneled through GroupM. Am. Compl. ¶ 19 (alleging that WPP acted "[t]hrough its subsidiary, GroupM"). GroupM, which is part of WPP, is an advertising agency incorporated in Delaware and headquartered in New York, New York, with no executives based in this district. Am. Compl. ¶ 20; App'x 9–10 (James Decl. ¶¶ 3–6).

Diageo plc is a multi-national alcoholic beverage company. Am. Compl. ¶ 18. It is organized under the laws of England and Wales and headquartered in London. App'x 12 (Edmunds Decl. ¶ 2); *see* Am. Compl. ¶ 18. It does not itself conduct business in Texas, have an office in Texas, or have any employees in Texas. App'x 12 (Edmunds Decl. ¶ 3).[2]

### B.    Rumble's business model involves minimal content moderation and brand-safety standards.

Rumble operates an online user-generated platform where users post videos to the site and view those videos, and Rumble monetizes these views by selling advertising space. Am. Compl. ¶ 26. Compared to other sites, Rumble has adopted lax moderation and content standards for its platform, meaning that it hosts user content that other sites would not host. Am. Compl. ¶ 28. As its website explains:

> Rumble is designed to be the rails and independent infrastructure that is immune to cancel culture. We are a movement that does not stifle, censor, or punish creativity and believe everyone benefits from access to a neutral network with diverse ideas and opinions. We are on a mission to restore the internet to its roots by making it free and open once again.[3]

---

[2] The Amended Complaint alleges that Diageo plc engages in a substantial volume of commerce "[t]hrough" Diageo North America, Inc., but Diageo North America Inc. is not a Defendant. *See* Am. Compl. ¶ 18.

[3] *Our Story*, Rumble, https://corp.rumble.com/our-story/.

Rumble's lax "content moderation standards" mirror its "brand safety standards." Am. Compl. ¶ 7. Although "content moderation standards" govern "what types of content may be shared on a user-generated platform," brand-safety standards are "designed to ensure that advertisements do not appear alongside content that might harm the reputation of a brand and potentially reduce sales." *Id.* Put differently, content moderation curates what content is on the platform whereas brand safety curates what content accompanies advertising.

Rumble has made a "commercial" and "philosophical choice" to use fewer brand-safety measures. Am. Compl. ¶ 27. As Rumble admits, this poses a "reputational and commercial" risk to advertisers, as objectionable content might be paired with their brand. Am. Compl. ¶¶ 7, 32, 34–35. This risk is especially acute on user-generated platforms, like Rumble, because user content is "immediately published and available to other users." Am. Compl. ¶¶ 2, 32.

Rumble believes that its hands-off moderation and brand-safety policies allow it to "differentiate" itself "from similar platforms to attract users and content creators." Am. Compl. ¶ 28. Rumble's strategy has worked—at least in terms of attracting a different group of users. Since 2020, Rumble alleges it has "attracted many new users and content creators." Am. Compl. ¶ 30. And Rumble alleges that it has attracted advertisers who are willing to accept less robust brand-safety protections. *See* Am. Compl. ¶¶ 29–30.

### C.    The Global Alliance for Responsible Media and the Brand Safety Framework

The Global Alliance for Responsible Media ("GARM") was a WFA initiative that lasted from 2019 through August 2024. Am. Compl. ¶¶ 16, 46. Defendants WPP, GroupM, and Diageo were members. Am. Compl. ¶¶ 16–20.

According to Rumble, GARM "promulgated standards relating to the placement of advertising on digital platforms," including "brand safety" standards regarding "the display of specified types of sensitive content" on advertiser-supported platforms. Am. Compl. ¶¶ 16, 46, 53.

Brand-safety standards are important to advertisers: if advertisements appear near illegal or inappropriate content, consumers may associate "the brand with" such content or believe "that the brand endorsed the" content. Am. Compl. ¶ 32.

GARM published a Brand Safety Floor and Suitability Framework ("Brand Safety Framework") in September 2020 and updated it in June 2022. The Brand Safety Framework, included in the Appendix, does two things. *See* Am. Compl. ¶ 47.[4] First, it creates a set of "common definitions" that identify and assign risk to twelve categories of online content that can harm an advertiser if its brand is associated with, or viewed alongside, that content: "Adult & Explicit Sexual Content"; "Arms & Ammunition"; "Crime & Harmful acts to individuals and Society, Human Rights Violations"; "Death, Injury or Military Conflict"; "Online piracy"; "Hate speech & acts of aggression"; "Obscenity and Profanity"; "Illegal Drugs/Tobacco/e-cigarettes/Vaping/Alcohol"; "Spam or Harmful Content"; "Terrorism"; and "Debated Sensitive Social Issue." App'x 3–4. Second, it lays out a "Brand Safety Floor" that identifies content "not appropriate for any advertising support." App'x 2. This includes things like child pornography, the sale of illegal guns, graphic violence, excessive profanity, the promotion of terrorism, or content that incites greater conflict. App'x 2.

The Brand Safety Framework is meant to produce "consistent categorization," "transparency," and "clarity in exceptions." App'x 1. GARM hoped that "[a]gencies will leverage the framework to guide how they invest with platforms" and that "[m]arketers will use the definitions to set brand risk and suitability standards for corporate, brand and campaign levels." App'x 1.

---

[4] Because the Brand Safety Framework is repeatedly referenced by and central to the Amended Complaint, *see, e.g.*, Am. Compl. ¶¶ 47, 57, 68, 94, this Court may consider the document in deciding Defendants' Motion to Dismiss. *Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022).

The Brand Safety Framework does *not* identify any particular website as unsuitable for advertising. *See* App'x 1–4. It does not identify any protections that websites should or must incorporate. And it does not require advertisers to withhold advertising from content. *See* App'x 1.

### D.    Rumble files this antitrust case.

Although neither Rumble nor Defendants have any connection to Texas, much less to this district or Wichita Falls, Rumble filed this case in the Wichita Falls Division under Section 1 of the Sherman Act. Compl., ECF No. 1. Rumble amended its complaint shortly thereafter. Am. Compl., ECF No. 13. Although Rumble alleges three separate claims, each claim is premised on the same theory of liability: that Defendants agreed with each other as part of GARM's Brand Safety Standards not to advertise on Rumble. In antitrust law, this theory is called a "group boycott."

Rumble alleges that, starting in June 2023, it reached out to GroupM and Diageo separately about advertising on Rumble's platform. Am. Compl. ¶¶ 50–51. GroupM and Diageo each separately declined. Am. Compl. ¶¶ 50–51. Rumble speculates that they did so because Rumble did not "implement policies based on GARM's preferred brand safety standards." Am. Compl. ¶¶ 29, 50. Rumble does not allege that Defendants have *ever* advertised on its platform, including before the Brand Safety Framework existed or before or after GARM was discontinued.

Based on these allegations, Rumble asserts three counts of supposed Sherman Act violations. Count I is labeled "Horizontal Agreement to Restrict Output." It asserts that Defendants "agreed to impose brand safety standards on user-generated platforms" with the purpose of reducing or eliminating "digital advertising on certain disfavored platforms." Am. Compl. ¶ 89. That is, Defendants allegedly agreed to boycott Rumble because it did not agree to GARM's brand-safety standards. Rumble styles Count II as a "Horizontal Agreement to Fix Certain Price-Related Terms." Am. Compl. ¶ 88. But there is no allegation that Defendants agreed to fix the price for anything. Rather, Count II merely alleges that the Brand Safety Standards "eliminat[ed]

competition among advertising agencies," which had the "effect of raising the price of digital advertising." Am. Compl. ¶ 94. So, in substance, this claim is again challenging the alleged decision not to advertise on Rumble. And Count III alleges that Defendants agreed not to purchase digital advertising. *See* Am. Compl. ¶ 99. Nomenclature aside, these three counts arise from the same conduct and are all substantively group-boycott claims (*i.e.*, that Defendants allegedly agreed to not advertise on Rumble).

Rumble does not allege that any of the challenged conduct occurred in Texas or this district. Rumble does not allege, for example, where the Brand Safety Framework was developed or agreed upon. *See* Am. Compl. ¶ 61 (alleging GARM members "collectively agree to adhere to GARM's standards," but not where they made this agreement). Rumble similarly does not allege where any decisions not to advertise on Rumble were made. *See, e.g.*, Am. Compl. ¶ 69.

### THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS

Federal Rule of Civil Procedure 12(b)(2) requires a court to dismiss claims against a defendant if the court does not have personal jurisdiction over that defendant. Plaintiffs must establish a *prima facie* case of personal jurisdiction. *Kelvin Serv., Inc. v. Lexington State Bank,* 46 F.3d 13, 14 (5th Cir. 1995). This requires more than "conclusory allegations." *Harbour v. Heyl Truck Lines, Inc.*, No. 24-CV-0183, 2024 WL 1317805, at *2 (N.D. Tex. Mar. 27, 2024) (Fitzwater, J.).[5] The Court may consider declarations and other evidence in addressing a motion to dismiss for lack of personal jurisdiction and is not required to accept allegations in the complaint that are contradicted by such evidence. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).

---

[5] Unless otherwise indicated, alterations, citations, and internal quotation marks have been omitted from quotations.

This case is entirely foreign to Texas. Plaintiffs are Canadian and Floridian companies; Defendants WFA, WPP, and Diageo are European companies; Defendant GroupM is based in New York; and there are no allegations that any of the challenged conduct occurred in this division or district. Defendants had no expectation that they would be brought to Texas to defend against these claims. This Court must dismiss for lack of personal jurisdiction.

## I.    There is no personal jurisdiction under Texas's long-arm statute.

Rumble cannot use Texas's long-arm statute for personal jurisdiction. Because Texas's long-arm statute is coextensive with the Due Process Clause, the long-arm statute applies only if the exercise of personal jurisdiction would be consistent with the Due Process Clause. *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). It would not.

Defendants are not subject to this Court's general jurisdiction. General jurisdiction requires "continuous and systematic general business contacts" with the forum, such that the defendant is "essentially at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 131, 139 (2014). "[T]he paradigm forum for the exercise of general jurisdiction" over a corporation is "the place of incorporation and principal place of business." *Id.* at 137. As Rumble acknowledges, no Defendant is either incorporated or has its principal place of business in Texas. *See* Am. Compl. ¶¶ 16–20; *supra* at 2–3 (citing declarations).

Defendants are also not subject to specific personal jurisdiction. Specific personal jurisdiction applies where "a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Sangha*, 882 F.3d at 101. The Amended Complaint is devoid of such allegations.

Rumble does not allege that any Defendant did anything in Texas. Rumble asserts without supporting factual allegations that Defendants "each transact a substantial volume of business in this District." Am. Compl. ¶ 23. This is entirely conclusory. Even if it were not, it would not support

8

personal jurisdiction because Rumble does not allege that this supposed and unidentified "substantial volume of business" has anything to do with the claims in *this* case. Rumble's allegations are about the Brand Safety Framework and Defendants' decisions not to advertise on Rumble (a Canadian platform), none of which are alleged to have occurred in Texas.

Rumble's other allegations fare no better. Rumble alleges that a Diageo *subsidiary* has an office in this district (Am. Compl. ¶ 23), but "a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 218 (5th Cir. 2000). Rumble also alleges that "members of the conspiracy"—but not Defendants themselves—committed acts "within the United States, including in this District." Am. Compl. ¶ 23. But Rumble must establish that Defendants "individually, and not as part of [a] conspiracy, had minimum contacts with Texas." *Delta Brands Inc. v. Danieli Corp.*, 99 F. App'x 1, 6 (5th Cir. 2004); *accord Eagle Metal Prods., LLC v. Keymark Enter., LLC*, 651 F. Supp. 2d 577, 593 (N.D. Tex. 2009) (Lynn, J.).

## II.    There is no personal jurisdiction under Section 12 of the Clayton Act because venue would not be proper under Section 12.

Rumble may argue that the Court has personal jurisdiction under Section 12 of the Clayton Act. Not so. The Clayton Act provides for personal jurisdiction in a court *only* if venue is also proper in that court under the Clayton Act. And, as Defendants explain below, venue is *not* proper in this district under the Clayton Act.

Section 12 makes clear that it authorizes personal jurisdiction only in a district where it also authorizes venue. It states, in full:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process *in such cases* may be served in the district of which it is an inhabitant, or wherever it may be found.

9

15 U.S.C. § 22 (emphasis added). The first sentence authorizes venue in antitrust cases in any district where the defendant resides, may be found, or transacts business. The second authorizes personal jurisdiction but only in "such cases"—that is, only in the cases where venue is proper according to the terms of the first sentence.

This is the plain and unambiguous meaning of the statute. *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000); *Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 422 (2d Cir. 2005). Congress's decision to place these two provisions in the same section and connect them with a semicolon indicates that the two provisions must be read together. *GTE*, 199 F.3d at 1351; *Daniel*, 428 F.3d at 424. Any other reading would require "literal convolutions," *GTE*, 199 F.3d at 1351, and would render the "venue inquiry meaningless." *KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 729 (7th Cir. 2013).

Unsurprisingly, most Courts of Appeals to consider this question have held that Section 12's personal-jurisdiction provision applies only where its venue counterpart is also satisfied. *GTE*, 199 F.3d at 1350–51 (D.C. Cir.); *KM Enters.*, 725 F.3d at 729–30 (7th Cir.); *Daniel*, 428 F.3d at 422 (2d Cir.). And although the Fifth Circuit has yet to address the issue, courts in this district have repeatedly adopted the majority approach. *See Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*, No. 23-cv-0155, 2024 WL 1218573, at *2 (N.D. Tex., Mar. 21, 2024) (Kacsmaryk, J.); *Mgmt. Insights, Inc. v. CIC Enter., Inc.*, 194 F. Supp. 2d 520, 530 (N.D. Tex. 2001) (Lynn, J.); *Ramzan v. GDS Holdings Ltd.*, No. 18-cv-539, 2019 WL 4748001, at *5 (E.D. Tex. Sept. 30, 2019); *Corr Wireless Commc'ns., L.L.C. v. AT & T, Inc.*, 907 F. Supp. 2d 793, 800 (N.D. Miss. 2012).[6]

---

[6] The Third and Ninth Circuits have gone the other way, relying on the Clayton Act's purpose and legislative history to decouple the venue and personal-jurisdiction provisions. *Go-Video, Inc. v.*

Because the Clayton Act authorizes personal jurisdiction only where venue is proper under that Act, and because, as discussed below, there is no venue under the Clayton Act, there is no personal jurisdiction under the Clayton Act.

## III.    Rule 4(k)(2) does not help Rumble.

Rumble may try to rely on Rule 4(k)(2), which provides for personal jurisdiction in "cases arising under federal law where the defendant has contacts with the United States as a whole sufficient to satisfy due process concerns and the defendant is not subject to jurisdiction in any particular state." Fed. R. Civ. P. 4(k)(2). But Rule 4(k)(2) does not apply to any Defendant.

*First*, Rumble cannot invoke Rule 4(k)(2) for WPP, Diageo, or WFA because exercising personal jurisdiction over these Defendants would violate the Due Process Clause. None of these Defendants are subject to general jurisdiction under Rule 4(k)(2) because their contacts with the United States are not "so continuous and systematic" as to render them "essentially at home" in the United States. *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 234–35 (5th Cir. 2022). They are incorporated and headquartered abroad, and there are no allegations that they otherwise have continuous and systematic contacts with the United States.

These Defendants are also not subject to specific jurisdiction in the United States because Rumble has not alleged "sufficient minimum contacts with the U.S." or a claim arising from those contacts. *Hardy v. Scandinavian Airlines Sys.*, 117 F.4th 252, 264 (5th Cir. 2024). Rumble does not allege facts plausibly showing that WPP has *any* contacts with the United States, much less contacts from which this case arises. That is because WPP does not have any contacts in the United

---

*Akai Elec. Co.*, 885 F2d 1406, 1408–11 (9th Cir. 1989); *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 296–97 (3d Cir. 2004). But that approach is entirely atextual. *See GTE*, 199 F.3d at 1351. And, as discussed, it has been rejected by the D.C., Second, and Seventh Circuits and by numerous district courts in this Circuit.

States, does not transact business inside the United States, and does not have any employees or executives based in the United States. App'x 8 (Kelly-Bisla Decl. ¶¶ 6–7).

Similarly, Rumble does not allege that either Diageo's supposed adoption of the Brand Safety Framework or its decision not to advertise with Rumble happened in the United States. *See* Am. Compl. ¶¶ 51–68. Indeed, the plausible inference is that a British company adopting a Brand Safety Framework developed by an initiative formed in Brussels and then choosing not to advertise on a Canadian platform made these decisions *outside* the United States. *See* App'x 12 (Edmunds Decl. ¶ 4). Rumble acknowledges that Defendant *Diageo plc* does not itself have sufficient contacts with the United States: alleging instead that "*[t]hrough its subsidiary, Diageo North America*, [Diageo plc] engages in a substantial volume of commerce throughout the United States." Am. Compl. ¶ 18 (emphasis added). But Rumble cannot use a subsidiary's contacts to establish jurisdiction over the parent. *Alpine View*, 205 F.3d at 218.

As for WFA, Rumble's only allegation that WFA has contacts with (or more precisely, *within*) the United States is that it has "an office in New York, New York." Am. Compl. ¶ 16. The text of Rule 4(k)(2) distinguishes between a defendant's contacts with the United States *as a whole* as opposed to any state within the United States. Fed. R. Civ. P. 4(k)(2). And in any event, this allegation says nothing about how this office space constitutes "sufficient minimum contacts" or how Rumble's claims necessarily arise from them.

*Second*, Rule 4(k)(2) does not provide jurisdiction over *any* Defendant because it applies only to defendants who refuse "to identify any other [forum] where suit is possible." *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004). Defendant GroupM concedes, for purposes of this litigation, that it may be sued in the Southern District of New York. And if this Court concludes that Diageo or WPP has sufficient minimum contacts with the United States to

satisfy due process, they agree, for purposes of this litigation only, that they may be sued in the Southern District of New York. *See Adams*, 364 F.3d at 651. WFA maintains that the Southern District of New York is the appropriate venue to determine whether it is subject to personal jurisdiction in the United States.[7]

### THE NORTHERN DISTRICT OF TEXAS IS NOT A PROPER VENUE

Even if a defendant is subject to jurisdiction, a "case must be dismissed or transferred under § 1406(a)" if "venue is improper." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 56 (2013). "[O]nce a Rule 12(b)(3) motion has been made," the plaintiff bears "the burden of establishing venue." *Southampton, Ltd. v. Le Norman*, No. 18-CV-1089, 2019 WL 7902959, at *3 (N.D. Tex. Sept. 3, 2019) (Kinkeade, J.). As with personal jurisdiction, the Court "may consider evidence in the record beyond [those] facts alleged in the complaint and its proper attachments." *Id.*; *see also Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). This includes affidavits or evidence submitted by the parties as part of the venue motion. *See Stuart*, 772 F.2d at 1192.

Rumble relies on both the Clayton Act and the general venue provision to claim that this suit can proceed in this district. *See* Am. Compl. ¶ 24. But neither provides venue. The Clayton Act does not provide venue because no Defendant resides or transacts business here. The general federal venue provision does not provide venue because nothing occurred here. This Court must therefore dismiss for improper venue. *See* Fed. R. Civ. P. 12(b)(3).

---

[7] WFA also maintains that, if the Court is so inclined, it may address venue issues first before deciding the personal jurisdiction issues and, assuming the Court resolves the venue issues through transfer, leave the jurisdiction issue for the transferee court to resolve. *See Victory Renewables, LLC v. Energy Trading Co., LLC*, No. 18-cv-00456, 2019 WL 2539209, at *2 (N.D. Tex. Feb. 8, 2019) (Rutherford, M.J.) (recognizing precedent for considering venue issues prior to jurisdictional issues "when there is a sound prudential justification for doing so" (citation omitted)). Here, "resolution of the venue issue [i.e., through transfer] may render the personal jurisdiction issues moot and avoid the need to address constitutional questions" regarding personal jurisdiction. *Id.*

## I.     The Clayton Act does not provide for venue in this district.

The Clayton Act provides that suits brought "under the antitrust laws against a corporation" may be litigated in "any district wherein [the corporation] may be found," is an "inhabitant," or "transacts business." 15 U.S.C. § 22; *see* 15 U.S.C. § 15 ("resides or is found or has an agent"). Rumble has not alleged that any Defendant satisfies these requirements for the Northern District of Texas.

### A.  Rumble has not alleged that any Defendant "transacts business" in this district.

A defendant "transacts business" in a district only if it engages in "[t]he practical, everyday business or commercial concept of doing or carrying on business of any substantial character." *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948). Or more plainly, a defendant transacts business if its "sales [in that district] would appear to be substantial from the average businessman's point of view." *Datamedia Comput. Serv., Inc. v. AVM Corp.*, 441 F.2d 604, 606 (5th Cir. 1971). Both "purchasing activity" and "sales activity constitutes the transaction of business." *Black v. Acme Mtks., Inc.*, 564 F.2d 681, 687 (5th Cir. 1977) (finding venue proper based on "$1.5 million worth of purchases from the Northern District of Texas in a single year"). Likewise, "the deliveries of substantial amounts of [a defendant's] product into a judicial district constitute the transaction of business." *Green v. U.S. Chewing Gum Mfg. Co.*, 224 F.2d 369, 374 (5th Cir. 1995) ("delivery of almost $600,000 worth of a company's product into the [district] within less than two years as part of sales transactions" constituted transaction of business).

By contrast, occasional, insubstantial, or purely internal activities in a district do not amount to "transacting business." Only activity "performed within the jurisdiction with continuity of character, regularity, contemporaneous with the service and not looking toward cessation of business" qualifies. *Mgmt. Insights, Inc.*, 194 F. Supp. 2d at 533; *see also Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 438 (5th Cir. 1977) (contacts with the venue must comprise

more "than an occasional sporadic contact"). "[A] single transaction of business may not be sufficient . . . ." *Datamedia*, 441 F.2d at 606; *see also B. J. Semel Assocs., Inc. v. United Fireworks Mfg. Co.*, 355 F.2d 827, 832 (D.C. Cir. 1965) (explaining that "[t]ransacts business" requires "continuity," not an "isolated transaction of modest proportions").

Although "the purchases and/or sales which constitute the transaction of business need not be connected to the subject matter of this suit," *Black*, 564 F.2d at 687, the need for continuity and regularity is heightened when the activity is unrelated to the plaintiff's cause of action. *See Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968) ("[C]onsideration must be given to the extent both of the defendant's business contacts with the chosen forum and of the plaintiff's contacts, including those relating to his cause of action."); *Am. Home Healthcare Sys., Inc. v. Floyd Mem'l Hosp. & Health Servs.*, No. 3:17-CV-00048, 2017 WL 2261740, at *3 (W.D. Ky. May 23, 2017) (when the antitrust claim is "entirely unrelated" to the alleged business transactions, those "transaction[s] do . . . little to weigh in favor of" venue).

Rumble contends that "each Defendant transacted business" in this district. Am. Compl. ¶ 24. But Rumble makes no specific allegation that any Defendant has purchased or sold a product or service in this district, much less engaged in regular, continuous, and substantial business activity. Rumble alleges, without supporting factual allegations, that each Defendant "transact[s] a substantial volume of business in this District." Am. Compl. ¶ 23. But "a mere unsupported allegation that the defendant 'transacts business' in an area" is inadequate. *See Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997). Rumble's other allegations are no better.

**WFA and GroupM.** Rumble claims that WFA and GroupM "represent advertisers that conduct business in this District." Am. Compl. ¶ 23. But venue cannot be based on what a

defendant's *clients* or *members* do. *See Golf City, Inc.*, 555 F.2d at 437 (activities conducted by "separate legal entity" are not imputed to "associated" companies); *Daniel*, 428 F.3d at 429. For example, a professional association does not transact business in a jurisdiction merely because some of its members live and conduct business there. *See Daniel*, 428 F.3d at 429. And a company's *clients* are far more distinct from a company than a professional association's *members* (which make up the association).

Rumble also alleges that GroupM, but not WFA, "advises clients on advertising campaigns that target consumers in this District." Am. Compl. ¶ 23. That consumers are targeted by brands advertising in this district does not mean that GroupM transacts any business here. Again, those advertisements involve GroupM's clients soliciting business for their own benefit. That is not GroupM "solicit[ing]" business for *itself*. *See King v. Johnson Wax Assocs., Inc.*, 565 F. Supp. 711, 717 (D. Md. 1983).

Even if a client's advertisements within this district *could* be imputed to GroupM or another Defendant, courts have generally rejected the idea that a defendant's advertising within a district, by itself, is enough. *See Daniel*, 428 F.3d at 429 (an association that "solicits advertising time in and transmits advertisements and other professional materials into the district" does not transact business in that district); *Golf City*, 555 F.2d at 438 (the defendant's advertising within the venue "is the most attenuated of contacts with the district"). That is doubly true where the only contact is "national advertising [that] finds its way into a particular jurisdiction." *San Antonio Tel. Co. v. Am. Tel. & Tel. Co.*, 499 F.2d 349, 351 n.5 (5th Cir. 1974). Because a company's decision to advertise in this district is insufficient to constitute transacting business, GroupM's work on *clients*' advertising campaigns plainly does not suffice.

16

*WPP and Diageo.* Rumble's allegations as to WPP and Diageo fall short because Rumble does not allege a single activity that WPP or Diageo supposedly performs here. That is because neither engages in business in this district. *See* App'x 12 (Edmunds Decl. ¶ 3). Indeed, WPP does not transact any business within the United States at all—it is purely a holding company. *See* App'x 12 (Edmunds Decl. ¶ 6).

At most, Rumble alleges that WPP's and Diageo's subsidiaries (GroupM and non-Defendant Diageo North America Inc.) engage in activities in this district. But "[a]llegations that certain of these defendants are parent companies of subsidiaries that transact business in [a district] do not suffice to show that the parent companies transact business in [that district]." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 199 (S.D.N.Y. 2018) (citing *Scophony Corp.*, 333 U.S. at 810–16). Rather, "venue may be established through a relationship between corporations" only "when they in effect comprise a single entity," based on "a total disregard for the separate corporate entities." *San Antonio Tel. Co.*, 499 F.2d at 352; *see also Scophony Corp.*, 333 U.S. at 814–15. Neither WPP nor Diageo plc is responsible for the "daily business affairs" of its US subsidiaries, and Rumble does not allege otherwise. *See* App'x 12 (Edmunds Decl. ¶ 7). Therefore, venue is improper against both WPP and Diageo.

**B.    Rumble has not alleged that any Defendant is an "inhabitant" of, or "found" in, this district.**

Just as Rumble has failed to establish that any Defendant transacts business in this district, it has likewise failed to establish that any Defendant is "found" here. A corporation is only "found" in a particular district if it has "agents carrying on business of such character and in such manner that it is . . . amenable to local process" there. *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 373 (1927). Rumble has not alleged that any Defendant has agents carrying on business

in the Northern District of Texas "of such character and in such manner that it is 'found' therein."

*Id.*

Finally, Rumble rightly does not even attempt to allege that any Defendant is an "inhabitant" of this district—because none is. A corporation inhabits a district only if it is incorporated there. *See Mgmt. Insights,*, 194 F. Supp. 2d at 532. And as Rumble concedes, each Defendant is incorporated elsewhere. Am. Compl. ¶¶ 16–20.

## II.    The general federal venue provision—28 U.S.C. § 1391—does not provide for venue in this district.

Rumble also relies on the general federal venue statute. *See* Am. Compl. ¶ 24 (citing 28 U.S.C. § 1391(b)). But this district is not the proper venue under that statute, either.

Section 1391(b)(1)—which provides for venue in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"—does not apply because no Defendant resides in this district or even in this State. Corporations reside in judicial districts where they are "subject to the court's personal jurisdiction with respect to the civil action in question." *Id.* § 1391(c)(2). And, as already explained, this Court lacks personal jurisdiction over each defendant. *Supra* at 7–12.

Venue is also not proper under Section 1391(b)(2) because none of the substantial events or omissions giving rise to Rumble's claims occurred here. Section 1391(b)(2) provides venue in a district where "a substantial part of the events or omissions giving rise to the claim occurred." But Rumble does not identify *any* specific conduct that occurred here, much less a substantial part of the conduct that gave rise to Rumble's claims. *See* Am. Compl. ¶ 23 (alleging that Defendants committed "substantial acts" in furtherance of the alleged antitrust conspiracy "within the United States, including this District," but offering no examples). This venue provision therefore does not apply. *See Daniel*, 428 F.3d at 434 (venue is improper where the "series of [anticompetitive]

18

actions" allegedly occurred at the company headquarters in another district); *Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n*, No. 3:08-cv-0158, 2008 WL 4146022, at \*14 (N.D. Tex. Sept. 9, 2008) (Fish, J.) (similar).

Finally, Section 1391(b)(3) does not apply. This provision provides venue in "any judicial district in which any defendant is subject to the court's personal jurisdiction," but *only* "if there is no district in which an action may otherwise be brought." Because the Amended Complaint does not support personal jurisdiction over WPP, Diageo, or WFA anywhere and because, as to GroupM, this case could have been brought in the Southern District of New York, *see supra* at 12, Section 1391(b)(3) does not provide venue.

### RUMBLE FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

Even if this Court concludes that it has personal jurisdiction over Defendants and that venue is proper, it should dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6).

"To withstand a motion to dismiss, a complaint must allege more than labels and conclusions, as a formulaic recitation of the elements of a cause of action will not do. It must state a plausible claim for relief, rather than facts merely consistent with liability." *Crosswell v. Martinez*, 120 F.4th 177, 184 (5th Cir. 2024). Although the Court accepts well-pleaded facts as true, it is not required to accept "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* at 183. Here, the Amended Complaint fails to plausibly allege facts showing (1) that there was an agreement not to advertise on Rumble, (2) that the alleged conduct qualifies for *per se* treatment, (3) that the decisions not to advertise on Rumble harmed competition in a relevant market, or (4) that Rumble is entitled to injunctive relief.

I.      **The Amended Complaint does not plausibly allege an agreement.**

Rumble's counts, all of which amount to a single group-boycott claim, arise under Section 1 of the Sherman Act (15 U.S.C. § 1). An "agreement" is "a necessary condition for Section 1 liability." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525–26 (5th Cir. 2022). This requirement is particularly important in the group-boycott context because, generally, "the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). "Only a *concerted* refusal to deal is illegal . . . ." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (emphasis added).

Accordingly, Rumble must plead a "conscious commitment" and a "meeting of the minds" among Defendants not to advertise on its platform. *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 374–75 (5th Cir. 2014). It is not enough for Rumble to allege facts "consistent" with an agreement or "conscious parallelism"; it must allege facts that tend to "exclude the possibility of independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–57 (2007). Conclusory claims of a global conspiracy aside, Rumble's plausible factual allegations come nowhere close.

A.      **Rumble never alleges that Defendants directly agreed not to advertise on its platform.**

The entire basis for Rumble's claims is the assertion that Defendants were part of a group boycott against Rumble. Yet, conspicuously absent is *any* allegation that Defendants directly agreed to not advertise on Rumble. Rather, the Amended Complaint alleges that Rumble reached out to GroupM and Diageo separately about advertising on its platform and that GroupM and Diageo separately declined to do so. Am. Compl. ¶¶ 51–52.

Lacking any direct allegations of an agreement, Rumble tries to imply one through a series of inferences. But as discussed below, these inferences lack plausible factual allegations and thus fall well short of establishing an agreement.

**B.      The Brand Safety Framework does not prohibit advertising on Rumble.**

Rumble asserts that Defendants agreed to adhere to the Brand Safety Framework and, through *that* agreement, Defendants effectively agreed not to advertise on Rumble. But the Brand Safety Framework does not identify any platform as being inappropriate for advertising or any brand-safety measures as being required. App'x 1–4. At most, it identifies certain content as presumptively inappropriate for advertising support (like child pornography, illegal activity, terrorism, etc.). *Id.* And Rumble does not allege that its platform only carries such content. To the contrary, Rumble alleges that it allows "advertisers and agencies flexibility to only advertise alongside desired content." Am. Compl. ¶ 56. "For example, on Rumble, a pet food company can exclude political content by choosing only to run its ads alongside categories of videos depicting cats or dogs." Am. Compl. ¶ 56; *see* Am. Compl. ¶ 29 (describing Rumble's advertising tools).

Put differently, according to Rumble's own allegations, advertising on Rumble is consistent with the Brand Safety Framework. So, even if Rumble had plausibly alleged that Defendants agreed to adhere to the Brand Safety Framework, it would not have stopped Defendants from advertising on Rumble (the complained-of harm).

**C.      There is no plausible allegation that Defendants agreed to make any advertising decisions because of the Brand Safety Framework.**

The Amended Complaint also does not plausibly allege that Defendants agreed to make any advertising decisions because of the Brand Safety Framework. The most Rumble alleges is that GARM's FAQs stated that "member organizations . . . agree to adopt GARM solutions to improve business operations" and should "adopt and implement [GARM] solutions both internally

and where working with partners." Am. Compl. ¶¶ 63, 65. This vague statement, which does not mention Rumble, GroupM, Diageo, or the Brand Safety Framework, is a far cry from a "meeting of the minds." Nor can any individual GARM member's alleged agreement "to adopt GARM solutions" be plausibly construed as an agreement among all GARM members to boycott any particular website.

The text of the Brand Safety Framework further dispels Rumble's speculation. The first page outlines its "goals" as "consistent categorization," "transparency," and "clarity in exceptions." App'x 1. It also states that advertising "[a]gencies will leverage the framework to guide how they invest with platforms" and "[m]arketers will use the definitions to set brand risk and suitability standards for corporate, brand and campaign levels." *Id.* The Brand Safety Framework does not identify Rumble (or any other platform) as inappropriate for advertising or any brand-safety measures as being required. App'x 1–4. It merely identifies *content* that is inappropriate for advertising support (like child pornography, illegal activity, terrorism, etc.). *Id.* It does *not* state that advertisers must adhere to the Brand Safety Framework or boycott any platform that fails to do so. Nor does it establish any consequences if an advertiser ignores the Brand Safety Framework. To the contrary, the statement that "[m]arketers will *use the definitions to set brand risk and suitability standards* for corporate, brand and campaign levels," *id.* (emphasis added), indicates that marketers use the Brand Safety Framework to inform their own unilateral advertising decisions.

Rumble alleges that Diageo has "adopted strict brand safety standards . . . *consistent* with GARM's requirements." Am. Compl. ¶ 51 (emphasis added). But that, too, falls short of alleging adherence. *See Twombly*, 550 U.S. at 553, 557 (holding that "conscious parallelism" and conduct "consistent" with an agreement is not enough).

So, Rumble is left with nothing more than the assertion that WPP, GroupM, and Diageo were members of an alleged standard-setting organization that set a standard individual advertisers *may* have referenced when unilaterally deciding where to advertise and that Rumble believes it does not meet. In two similar cases, the Fifth Circuit held that such allegations are insufficient to establish the necessary agreement for a Section 1 claim. *See Marucci*, 751 F.3d at 375; *Consol. Metal Prods. v. Am. Petrol. Inst.*, 846 F.2d 284 (5th Cir. 1988).

First, in *Marucci*, the plaintiff alleged that defendants had established a standard for baseball bats designed to protect incumbent manufacturers and exclude new entrants like the plaintiff. 751 F.3d at 372. But the court affirmed dismissal, reasoning that these allegations did not support an agreement because the mere participation in the standard-setting process did not establish the necessary "meeting of the minds" to specifically exclude new entrants, especially where the plaintiff's unadorned allegations of a "conspiracy" lacked "any specific *facts*." *Id.* at 375. So too here, the only plausible *facts* that Rumble alleges are that Defendants participated in a standard-setting process and that, according to Rumble, its brand-safety measures fall below that standard. Given Rumble's admittedly lax approach to content moderation and brand safety, it is therefore not surprising that some (perhaps many) individual advertisers might unilaterally elect not to advertise on Rumble.

Second, in *Consolidated Metal*, the plaintiff sued the American Petroleum Institute, a standard-setting organization that had temporarily deemed plaintiff's oil-well equipment sub-standard. 846 F.2d at 286. In holding that the plaintiff failed to establish the necessary agreement, the Fifth Circuit explained that "[a] trade association by its nature involves collective action by competitors. Nonetheless, a trade association is not by its nature a 'walking conspiracy,' its every denial of some benefit amounting to an unreasonable restraint of trade." *Id.* at 293–94. Because

the plaintiff had not excluded the possibility that the members of the standard-setting organization acted independently, and because the plaintiff had not shown that the standard-setting process was "merely a ploy to obscure a conspiracy against competing producers," the plaintiff failed to establish an agreement. *Id.* at 294–95; *see Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271–73 (5th Cir. 2008) (similar); *see also Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 764–65 (5th Cir. 2002) (no agreement where plaintiff failed to show professional association's ethics proceedings were a sham). Likewise, here, Rumble does not allege that the Brand Safety Framework is some sort of sham designed to hide a conspiracy against Rumble. Rumble does not even allege that GARM and/or Defendants deemed Rumble to be sub-standard.

### D. The timing of Defendants' decisions, and simple economic common sense, refute any inference of agreement.

Rumble was created in 2013. Am. Compl. ¶ 26. GARM issued its Brand Safety Framework in September 2020. Am. Compl. ¶ 47. GARM shut down in August 2024. Am. Compl. ¶ 53. But the Amended Complaint does not allege that Diageo has *ever* advertised on Rumble or that GroupM has *ever* facilitated advertising on Rumble. *See* Am. Compl. ¶¶ 50–53. So, the supposed harm from the conspiracy—Diageo and GroupM not advertising or facilitating advertising on Rumble—existed before, during, and after the alleged conspiracy. This strongly suggests that the decisions not to advertise on Rumble had nothing to do with the Brand Safety Framework and were unilateral. *See Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) (rejecting antitrust claims where the alleged anticompetitive harm existed before, during, and after the challenged conduct).

Far from excluding the possibility of independent action, the Amended Complaint's allegations confirm that there are perfectly procompetitive and unilateral reasons—having nothing to do with GARM—that would lead brands not to advertise on Rumble. As the Amended

Complaint alleges, Rumble has made a "commercial" and "philosophical choice" to offer less content-moderation and brand-safety measures than other platforms. Am. Compl. ¶ 27. According to Rumble, this means that advertising on Rumble is cheaper than competitors, but it is also riskier for brands. *See* Am. Compl. ¶ 56. Rumble has far fewer users than far more well-known websites such as YouTube, Meta, or Twitter (X). By Rumble's own allegations, no sweeping conspiracy is needed to explain why brands would have separately and unilaterally chosen not to advertise on Rumble, which prides itself on allowing content other sites will not allow. *See* Am. Compl. ¶ 28; *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 537 (N.D. Tex. 2014) (Boyle, J.) (relying on "common economic experience" and the complaint's own allegations to conclude that there was an "obvious" explanation for the defendants' parallel conduct).

Further, the Court should not infer an agreement because Rumble's conspiracy theory makes no economic sense. The Amended Complaint does not allege that Defendants compete with Rumble. This means that Defendants have nothing to gain from harming Rumble. Also, the Amended Complaint alleges that Rumble is cheaper than other platforms and that GARM's former members would prefer to advertise on Rumble. Am. Compl. ¶¶ 8, 29, 56. It further alleges that other platforms that employ higher brand-safety standards "pass those costs on to advertisers by charging higher prices for advertising space." Am. Compl. ¶ 33. Why would GARM's members engage in a boycott that would steer advertising away from Rumble and thereby push advertising prices even higher on the platforms where they do advertise? Rumble never says. Given Rumble's failure to provide any economically sensible reason for the purported agreement, the more likely explanation is that the small group of brands Rumble chose to sue independently decided that advertising on Rumble was not worth the risk. *See Tunica Web Advert. v. Tunica Casino Operators*

*Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007) ("Courts considering section 1 cases will not draw inferences to support a claim that makes no economic sense.").

## II.    Rumble does not plausibly allege a *per se* violation of the Sherman Act.

Rumble asserts that its allegations rise to the level of a *per se* violation of the Sherman Act. Am. Compl. ¶¶ 91, 96, 101. But only a small group of restraints that are "so pernicious and devoid of redeeming virtue" that they can be condemned without further inquiry qualify for *per se* treatment. *Marucci*, 751 F.3d at 373; *see Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (holding that *per se* treatment is limited to a "small group" of restraints that "always or almost always" harm competition). Group-boycott claims—as Rumble alleges here—receive *per se* treatment only in certain situations not alleged here. *See Tunica*, 496 F.3d at 413–14.

Rumble does not—and cannot—allege that WFA (a not-for-profit trade association), GroupM (an advertising group), or Diageo (a beverage alcohol company) compete with Rumble (an online video platform). Rumble's claims thus lack a hallmark of the group boycotts that receive *per se* treatment: a conspiracy to prevent a *competitor* from receiving an essential input or access to customers. *See Tunica*, 496 F.3d at 413–14; *MM Steel*, 806 F.3d at 848.

In evaluating group boycotts where competitors are not excluding a fellow competitor, the Fifth Circuit has held that district courts "should consider" the following factors in determining whether *per se* treatment may still be appropriate: whether (1) defendants are horizontal competitors in the relevant market, (2) defendants have a dominant market position in the relevant market, (3) defendants control access to an input necessary for the plaintiff to compete, *and* (4) the agreement lacks any procompetitive benefits. *Tunica*, 496 F.3d at 414–15; *see also MM Steel*, 806 F.3d at 850. Rumble alleges none of this.

*First*, WFA, GroupM, and Diageo are not horizontal competitors. There are no allegations that WFA, as a not-for-profit international trade association, competes for any commercial digital

advertising at all. *See* Am. Compl. ¶¶ 50–51 (alleging that Rumble reached out to GroupM and Diageo but making no such allegations about WFA). And there are no allegations that GroupM and Diageo compete for advertising. GroupM is an advertising enterprise that matches brands and websites (as well as other media such as television, radio, and streaming, among many others) together and facilitates advertising. Am. Compl. ¶ 20. Diageo, by contrast, is a multi-national alcoholic beverage company—the sort of company GroupM might represent. Am. Compl. ¶ 18. Indeed, the Amended Complaint draws sharp distinctions between advertising agencies and their company clients. Am. Compl. ¶ 35. This is all fatal under *Tunica* and the Supreme Court's admonition that "[t]ypically only 'horizontal' restraints—restraints imposed by agreement between competitors—qualify as unreasonable *per se*." *Am. Express*, 585 U.S. at 540–41.

*Second*, Rumble does not allege that Defendants have a "dominant" position in Rumble's alleged market for digital advertising on user-generated platforms—which, as discussed below, is not a viable relevant market in any event. This requires Defendants and the other alleged conspirators to be able to "cut off access to a supply, facility, or market" that is *necessary* for Rumble to compete. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). But the allegations show the opposite—Rumble alleges that it has experienced "significant growth" without any advertising from Defendants or other former GARM members. Am. Compl. ¶ 30. Securing advertising from Defendants may be *desirable*, but there are no allegations that it is *necessary*. *Cf.* Am. Compl. ¶ 84.

*Third,* there are no allegations that Rumble has been unable to secure an input necessary to compete. Rumble's theory appears to be that Defendants have prevented it from accessing advertising. But as Rumble admits, it has generated advertising revenue and experienced "significant growth" Am. Compl. ¶¶ 26, 30. Rumble's only complaint is that it "has not seen a

growth in advertising revenue *commensurate* to its growth in user popularity." Am. Compl. ¶ 30 (emphasis added). This falls far short of alleging that Rumble has been unable to access advertising or achieve scale.

Because Rumble still has access to advertising, it has not plausibly alleged that it has been blocked from an input essential to competition. In *Consolidated Metal*, for example, the Fifth Circuit held that *per se* treatment was inappropriate for a claim against a standard-setting organization because, although approval from that organization was "very important," the plaintiff was still able to sell its sub-standard product, and consumers were still free to buy that product. 846 F.2d at 292, 295; *see also Tunica*, 496 F.3d at 414 (explaining that a court must consider whether defendants withheld "an element necessary to enable [plaintiff] to compete"). So too here, *per se* treatment is inappropriate given Rumble's admission that advertising on its site has grown.

*Fourth*, as Rumble's own allegations and the caselaw confirm, the Brand Safety Framework had procompetitive benefits. *See infra* at 34–35. The entire point of the *per se* framework is to streamline cases where the allegations by themselves establish harm to competition with no redeeming benefit. *Marucci*, 751 F.3d at 374. That the Brand Safety Framework had procompetitive benefits thus puts the challenged conduct outside *per se* treatment.

## III.    Rumble has not plausibly alleged a Sherman Act violation under the rule of reason.

Where, as here, there is no *per se* violation, courts use the "rule of reason" to determine if a practice violates the Sherman Act. *Am. Express*, 585 U.S. at 541. This requires Rumble to define a valid relevant market and to show substantial anticompetitive harm in that relevant market. *Id.* But Rumble's proposed market is both irreconcilable with Rumble's theory of harm and impermissibly gerrymandered. Separately, Rumble has not plausibly alleged a substantial harm to *competition*—rather than harm to itself—especially considering the Brand Safety Framework's acknowledged procompetitive benefits. *See NCAA v. Alston*, 594 U.S. 69, 96–97 (2021).

### A.    Rumble has not defined a viable relevant market.

A plaintiff must allege a plausible relevant market because, "[w]ithout a definition of the market[,] there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express*, 585 U.S. at 543. As a result, courts readily dismiss complaints that fail to plausibly allege a valid relevant market. *E.g.*, *New Orleans Assoc. of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1037 (5th Cir. 2023); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010); *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 746 (5th Cir. 2010). Rumble alleges that the relevant market here is the "market for digital advertising on user-generated platforms." Am. Compl. ¶ 73.[8] But that market fails twice over.

*First*, Rumble's market definition is a complete mismatch with Rumble's theory of liability. Most Section 1 cases involve alleged *seller* conspiracies, where the sellers of a product are alleged to have entered an anticompetitive agreement as to that product. *See Quality Auto Body, Inc. v. Allstate Ins. Co.*, No. 79-cv-3351, 1980 WL 1887, at *5 (N.D. Ill. Aug. 19, 1980) (noting that buyer conspiracies "are rare"). But Defendants GroupM and Diageo *buy* digital advertising space. (Defendants WPP and WFA do not buy or sell anything at all.) Rumble is therefore pursuing a *buyer* conspiracy, where purchasers of advertising space (*i.e.*, placement on Rumble's platform) have allegedly entered an agreement as to that product. *See* Am. Compl. ¶ 80 ("buy side"); *Kamakahi v. Am. Soc'y for Reproductive Med.*, No. 11-cv-01781, 2013 WL 1768706, at *7 (N.D. Cal. Mar. 29, 2013) (contrasting buyer conspiracies with "traditional" seller conspiracy). Rumble thus defines a market for a *seller* conspiracy while alleging a *buyer* conspiracy.

---

[8] Elsewhere in the Amended Complaint, Rumble maintains that "user-generated platforms" is *not* an appropriate relevant market. Am. Compl. ¶ 1.

This is a critical failure because, in a buyer conspiracy, the relevant-market inquiry is reversed. *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008). In an alleged seller conspiracy, the relevant market centers on the seller's products (and reasonably interchangeable alternatives). *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). But in an alleged buyer conspiracy, the "market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Todd*, 275 F.3d at 202; *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018); *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1315 (10th Cir. 2017); *Kamakahi*, 2013 WL 1768706, at *11.

Rumble does not attempt to define such a market. Rather, it claims the relevant market is "digital advertising on user-generated platforms" (*i.e.*, the product it sells) and then attempts to justify that market with references to that product's characteristics. Am. Compl. ¶¶ 73–78. Rumble instead was required to define a market consisting of competing *buyers* of digital advertising space with reference to whether those buyers are reasonably interchangeable from the sellers' perspective. *Todd*, 275 F.3d at 201–02. But it has not done so. This alone warrants dismissal. *See id.* (reversing district court for making the same error).

*Second*, mismatch aside, Rumble's proposed market is impermissibly narrowed to advertising that is: (1) digital (excluding competitive substitutes like offline, print, radio, and television advertising), (2) display in form (excluding advertising on search engines), and (3) on user-generated platforms (excluding the vast swath of online advertising on non-user-generated platforms). Am. Compl. ¶¶ 73–78. Indeed, Rumble hints at—but does not actually allege—a fourth narrowing to user-generated *video* platforms. Am. Compl. ¶ 78.

But Rumble cannot "gerrymander its way to an antitrust victory." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016); *accord FTC v. Tempur Sealy Int'l, Inc*, No. 4:24-cv-02508, 2025 WL 384493, at \*24 (S.D. Tex. Jan. 31, 2025). It must define a market that "correspond[s] to the commercial realities of the industry," *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1048–49 (5th Cir. 2023), and that includes "commodities reasonably interchangeable by consumers for the same purposes," *E.I. du Pont*, 351 U.S. at 395. Such interchangeability is often measured by cross-elasticity of demand: the degree to which an increase in the price of one product increases demand for a different product. *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236 n.3 (5th Cir. 1996). Where a plaintiff fails to support a proposed market with plausible factual allegations "of reasonable interchangeability and cross-elasticity of demand . . . a motion to dismiss may be granted." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002).

Rumble does not allege that non-digital, non-display, or non-user-generated-platform advertising do not serve the same purpose as digital-display advertising on user-generated platforms. Rumble does not make any allegations about cross-elasticity of demand. Nor does Rumble allege that *Brown Shoe*'s "practical indicia" support its market definition. *See Illumina*, 88 F.4th at 1049 (citing 370 U.S. 294, 325 (1962)). For example, Rumble does not allege that digital-display advertising on user-generated platforms has a distinct purpose, distinct production facilities, distinct customers, or distinct prices. *See id.*

Rumble mainly alleges that non-digital advertising and advertising on non-user-generated platforms must be excluded because they are *less* targeted than digital-display advertising on user-generated platforms. Am. Compl. ¶¶ 74, 77. Rumble then claims that search-engine advertising must be excluded because it is *more* targeted than digital-display advertising on user-generated

platforms. Am. Compl. ¶ 76. This Goldilocks approach misses the mark; "two products need not be identical" or "*perfect* substitutes" to be in the same market. *Illumina*, 88 F.4th at 1050. "[R]ather, the question is merely whether they are similar in character or use." *Id.* Nothing in the Amended Complaint supports the conclusion that digital-display advertising on user-generated platforms is not "similar in character or use" to other advertising, including digital-display advertising on non-user-generated platforms.

Rumble also claims that advertising on user-generated platforms is different "[b]ecause user-generated platforms generally require users to create an account." Am. Compl. ¶ 77. The word "generally" is doing a lot of work, considering that Rumble itself does not require users to create an account before they can watch videos (and advertisements).[9] Neither does YouTube.[10] Implausibility aside, this difference, like the others, comes nowhere close to justifying Rumble's sliver of a sliver of a sliver of a market.

### B.  Rumble has not plausibly alleged harm to competition.

The antitrust laws "protect competition, not competitors." *Marucci*, 751 F.3d at 376. Thus, Rumble must allege facts showing "injuries to the market," not just injuries to itself. *Id.*; *see Consol. Metal*, 846 F.2d at 292–93. Injuries to the market are typically things like "reduced output, increased prices, or decreased quality in the relevant market." *Am. Express*, 585 U.S. at 542. In an alleged buyer conspiracy, the typical antitrust concern is that buyers will reduce output (purchases) and thus decrease prices below competitive levels, which may in turn reduce innovation or quality. *Lifewatch*, 902 F.3d at 340; *see generally* Phillip E. Areeda & Herbert Hovenkamp, *An Analysis of Antitrust Principles and Their Application* ¶¶ 350b, 575. Rumble has failed to allege such an injury.

---

[9] *See* Rumble Home Page, https://rumble.com/ (last accessed February 18, 2025).

[10] *See* YouTube Home Page, https://www.youtube.com/ (last accessed February 18, 2025).

*First*, although Rumble asserts that the boycott "restrict[ed] the output of digital advertising on user-generated platforms," Am. Compl. ¶ 89, Rumble alleges no *facts* to support that conclusion. Rumble does not allege who was part of any boycott. Rumble does not allege how much was spent on advertising in any market before, during, or after GARM's existence. Rumble does not identify any platform other than itself that supposedly lost advertising because of the alleged boycott. Without any factual allegations about the levels of advertising spending, Rumble has not adequately alleged that advertising spending (output) was restricted across the market. Indeed, as discussed below, the plausible inference of Rumble's allegations is that the Brand Safety Framework likely *increased* advertising output. *See* Am. Compl. ¶¶ 43–46; *infra* at 34–35.

Rumble asserts that it "has not seen a growth in advertising revenue commensurate to its growth in user popularity." Am. Compl. ¶ 30. But even if advertisers had reduced or stopped purchasing space at Rumble, or did not buy as much as Rumble thinks they should have, that at most shows that *Rumble* was harmed, which is insufficient to show that c*ompetition* was harmed. *See Marucci*, 751 F.3d at 376 (affirming dismissal in such circumstances). The fact that Rumble did not grow as fast as it wanted does not suggest that the advertising it wished to host evaporated as opposed to landing at a different platform that is more attractive to advertisers. A mere "realignment" of advertising purchasing is not an antitrust concern. *See also Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1246 (3d Cir. 1987); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 360 (2d Cir. 1979).[11] When a customer "substitutes one supplier for another," that undoubtedly injures "the terminated supplier," *Jebaco, Inc. v. Harrah's Operating Co.*, 587

---

[11] This failure likewise deprives Rumble of antitrust standing, which requires the plaintiff to show an "injury of the type the antitrust laws were intended to prevent," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), not just a harm to plaintiff's own bottom line, *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249–50 (3d Cir. 2022).

F.3d 314, 320 (5th Cir. 2009), but "loss in the form of customers' choosing the competitor's goods and services over the plaintiff's . . . does not constitute antitrust injury." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 489 (5th Cir. 2022).

*Second*, Rumble claims that the alleged conspiracy affected advertising prices, but it cannot keep its story straight. The Amended Complaint simultaneously asserts that by reducing advertising spending, the alleged conspiracy somehow both caused advertising prices to *decrease* (Am. Compl. ¶ 82) and to *increase* (Am. Compl. ¶¶ 89, 94). These self-contradictory assertions are also conclusory. Rumble does not allege any facts showing that the price for digital advertising market-wide has increased or decreased during GARM's existence.

*Third*, Rumble complains that the Brand Safety Framework "eliminates the need for agencies and advertisers to compete with one another through individual standards." Am. Compl. ¶ 54. But that is true of *every* standard-setting organization and contrary to the understanding that standard-setting organizations have procompetitive benefits. *E.g.*, *Golden Bridge*, 547 F.3d at 273 ("[S]uch exclusions are not themselves antitrust violations"); *Consol. Metal Prods., Inc.*, 846 F.2d at 294 ("axiomatic" that some product will be excluded).

*Fourth*, Rumble asserts several harms for which it lacks standing. The Amended Complaint alleges that some user-generated platforms were forced to adopt costly brand-safety measures and that some companies faced reduced advertising choices from their advertising agencies. Am. Compl. ¶¶ 1, 35, 42, 44–45, 57–58, 87. But Rumble does not allege that it is one of these companies. Am. Compl. ¶ 8. And Rumble is not the client of an advertising agency. *See* Am. Compl. ¶¶ 13–15. These purported harms are thus not harms to *Rumble*, and Rumble lacks both Article III standing and antitrust standing to assert them. *E.g.*, *Jones v. Reeves*, 121 F.4th 531, 535 (5th Cir. 2024) (Article III); *Norris v. Hearst Tr.*, 500 F.3d 454, 465–66 (5th Cir. 2007) (antitrust standing).

**C.    The procompetitive benefits of brand-safety standards outweigh any anticompetitive harms.**

Even at the pleadings stage, any alleged harm to competition must be balanced against procompetitive benefits. *Marucci*, 751 F.3d at 376–77. Rumble alleges that GARM is a standard-setting organization by virtue of its adoption of the Brand Safety Framework. Am. Compl. ¶¶ 46–48. But standard-setting organizations have well-established procompetitive benefits. *Golden Bridge*, 547 F.3d at 273; *see SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 435 (4th Cir. 2015) ("decidedly procompetitive effects").

One benefit is that standards can help reduce transaction costs and improve the availability of product information for purchasers. *Consol Metal*, 846 F.2d at 296 ("Product information is crucial to a competitive market."); *see Golden Bridge*, 547 F.3d at 273 ("Reduc[e] consumer search costs" and "increase[e] economic efficiency"). As alleged, the Brand Safety Framework does just that. By creating a set of common definitions and risk categories, the Brand Safety Framework reduces transaction costs and allows platforms, advertising agencies, and advertisers to more easily negotiate advertising arrangements. *See Universal Amusements Co. v. Gen. Cinema Corp.*, 635 F. Supp. 1505, 1522 (S.D. Tex. 1985).

The Amended Complaint acknowledges other procompetitive benefits, too. "Brand safety standards . . . are designed to ensure that advertisements do not appear alongside content that might harm the reputation of a brand and potentially reduce sales." Am. Compl. ¶ 7; *see id.* ¶ 3 (noting the need to mitigate such risk); *id.* ¶ 34 ("could cause reputational and commercial harm to their brand"). If advertisements appear next to illegal, offensive, or controversial content, it can harm the brand and the company's public image and thus lead to reduced output. That risk is particularly acute on user-generated platforms, where "the content posted by users is immediately published," Am. Compl. ¶ 2, and on Rumble, which attracts creators that have been removed from other

platforms, Am. Compl. ¶ 28. By establishing a floor that helps advertisers avoid placing their content next to videos of terrorism, child pornography, animal cruelty, or hot-button political issues (App'x 2), the Brand Safety Framework protects advertisers and increases output of the advertised products, which is procompetitive. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388, 393 (8th Cir. 2007) (advertising restrictions designed to protect advertisers' "public image" can be procompetitive); *Consol. Metal*, 846 F.2d at 296 n.46 (standard-setting was procompetitive where it "reduce[d] uncertainty," and so increased "demand for the product and encourage[d] [platforms] to improve their products").

## IV.    The Amended Complaint's vague request for injunctive relief must be dismissed.

This Court should dismiss the Amended Complaint's request for a permanent injunction. Using the antitrust laws to require companies to deal with another "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Trinko*, 540 U.S. at 408. This poor fit is accentuated here, because Defendants are not alleged to have a prior or existing relationship with Rumble. So, granting injunctive relief would require this Court to create a commercial relationship out of whole cloth— one that may not even be profitable to the parties—and then judicially monitor that relationship on an ongoing and indefinite basis.

Rumble's requested relief also has troubling First Amendment implications. "[A]dvertising itself is protected commercial speech." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). And "editorial discretion in the selection and presentation of content" is protected "speech activity." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2402 (2024). Rumble has made a "philosophical" choice about the sort of content it allows on its platform. Am. Compl. ¶ 27. The First Amendment protects that choice. It equally protects brands' decisions not to speak on Rumble's platform. Just as it would violate the First Amendment for the government to tell

Rumble what content it must host on its website, it would be similarly unconstitutional for this Court to order Defendants to speak on Rumble. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

CONCLUSION

This Court should dismiss the Amended Complaint for lack of jurisdiction and improper venue. If it finds jurisdiction and venue, the Court should dismiss the Amended Complaint for failure to state a claim.

Dated: February 21, 2025                    Respectfully submitted,

                                            */s/ D. Bruce Hoffman*
                                            D. Bruce Hoffman (*pro hac vice*)
                                            Jacob M. Coate (*pro hac vice*)
                                            CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                            2112 Pennsylvania Avenue, NW
                                            Washington, DC 20037
                                            Telephone: (202) 974-1500
                                            bhoffman@cgsh.com
                                            jcoate@cgsh.com

                                            Catherine L. Guerrier (*pro hac vice*)
                                            CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                            One Liberty Plaza, 1 Liberty Pl
                                            New York, NY 10006
                                            Telephone: (212) 225-2138
                                            cguerrier@cgsh.com

                                            Amber M. Rogers
                                            Theanna Bezney
                                            HUNTON ANDREWS KURTH
                                            1445 Ross Ave. #3700
                                            Dallas, TX 75202
                                            Telephone: (214) 468-3308
                                            arogers@hunton.com
                                            tbezney@hunton.com

                                            *Counsel for Defendant Diageo, plc*

                                            */s/ Steven P. Lehotsky*
                                            Steven P. Lehotsky (*pro hac vice*)
                                            LEHOTSKY KELLER COHN LLP
                                            200 Massachusetts Avenue, NW
                                            Washington, DC 20001
                                            (512) 693-8350
                                            steve@lkcfirm.com

                                            Andrew B. Davis (*pro hac vice*)
                                            Texas Bar No. 24082898
                                            LEHOTSKY KELLER COHN LLP
                                            408 W. 11st Street, 5th Floor
                                            Austin, TX 78701
                                            (512) 693-8350

andrew@lkcfirm.com

Drew F. Waldbeser (*pro hac vice*)
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
drew@lkcfirm.com

Andrew B. Ryan
Texas Bar No. 24054464
RYAN LAW PARTNERS LLP
3811 Turtle Creek Blvd.
Suite 1450
Dallas, TX 75219
(214 347-7360)
andy@ryanlawpartners.com

*Counsel for Defendant WPP PLC and GroupM Worldwide, Inc.*

*/s/ David C. Miller*
David C. Miller
Texas Bar No. 24110114
William S. Snyder
Texas Bar No. 00786250
Samuel T. Acker
Texas Bar No. 24100111
BRADLEY ARANT BOULT CUMMINGS LLP
1445 Ross Avenue, Suite 3600
Dallas, TX 75202
Telephone: (214) 257-9800
Facsimile: (214) 939-8787
dmiller@bradley.com
wsnyder@bradley.com
sacker@bradley.com

Charles E. Elder (*pro hac vice*)
Tennessee Bar No. 038250
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway, Suite 2400
Nashville, TN 37203

39

Telephone: (615) 252-3597
Facsimile: (615) 252-6380
celder@bradley.com

*Counsel for Defendant World Federation of Advertisers*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2025, the foregoing document was electronically filed with the Clerk of the U.S. District Court for the Northern District of Texas using the electronic case filing system of the Court, which will transmit a notice of electronic filing to all counsel of record.

<u>*/s/ D. Bruce Hoffman*</u>
D. Bruce Hoffman